**Ronald Dean MURRAY, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–76–400.**

Court of Criminal Appeals of Oklahoma.

April 8, 1977.

Rehearing Denied May 2, 1977.

Don Anderson, Public Defender, Oklahoma County, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Annis Kernan, Legal Intern, for appellee.

## OPINION

BUSSEY, Presiding Judge:

Appellant, Ronald Dean Murray, hereinafter referred to as defendant, was charged, tried and convicted by jury in the District Court, Oklahoma County, Case No. CRF–73–2426, with the offense of Murder in the Second Degree, in violation of 21 O.S.Supp.1973, § 701.2. He was sentenced to serve an indeterminate term of ten (10) years to life imprisonment in the custody of the Department of Corrections at the penitentiary in McAlester, Oklahoma. From said judgment and sentence, the defendant has perfected a timely appeal to this Court.

The State called nine witnesses to testify on its behalf, three of whom appeared by means of a transcript made during an earlier trial in which the defendant and his co-defendant were tried jointly. The testimony from the prior transcript of Carolyn Irene Haas, Eileen Kay Waggoner, Roberta Lynn Tanksley revealed that on August 29, 1973, several persons including the three witnesses and the defendant and Danny Grizzle, were residents of the Sandpiper South Apartments, No. 65. At 8:00 p. m., the defendant, Danny Grizzle, and Patrick O'Connor left the apartment. At approximately 10:30 p. m., the defendant and Grizzle returned without Patrick O'Connor. The defendant and Grizzle then accompanied the witnesses to Glen's Hickory Inn for dinner. Danny Grizzle paid the check with

a fifty dollar bill. The defendant appeared to be nervous during the meal and ate only a small portion.

Both Carolyn Haas and Eileen Waggoner overheard a conversation between the defendant and Grizzle concerning a pound of marijuana Grizzle was planning to sell to O'Connor for $100.00. The women had seen Danny Grizzle with a gun before and after he and the defendant returned to the apartment. Furthermore, on August 30, 1973, Danny Grizzle gave Carolyn Haas some bullets to hide for him, which she later turned over to the police. Lynn Tanksley was instructed by Danny Grizzle to hide a gun, but she later turned it over to the police.

Officer Robert Thomas of the Oklahoma City Police Department testified as the State's fourth witness. On August 30, 1973, the officer was called to the vicinity of Choctaw Road and Southeast 44th, where he saw the body of Patrick O'Connor. The officer observed that dried blood appeared on the victim's nose and mouth, and the victim appeared to have been killed by an injury to the back of the head. The officer was able to identify the decedent because the name F. Patrick O'Connor was stenciled on the waistband of the victim's underwear. Officer Thompson observed the autopsy performed on the decedent by Dr. Fred Jordan. During the autopsy, several fragments of a .38 caliber slug were removed from the brain by Dr. Jordan, but matching the fragments with the murder weapon was impossible because of the deterioration of the bullet. Dr. Fred Jordan determined that the cause of death to have been the result of a gunshot wound to the back of the head.

The State called Adam J. Knight as its next witness. The Sergeant stated that on August 30, 1973, he went to the Sandpiper Apartments and arrested five females and three males in connection with the homicide of Partick O'Connor. Later that evening, Sergeant Knight returned to the apartment accompanied by Ms. Tanksley who after consenting to the search, directed the police to a .38 caliber revolver and .38 caliber shells located in an upstairs bedroom. The

officers were interrupted by a visitor to the apartment, identified as the defendant. He was arrested, given his *Miranda* warnings and related the following details to Sgt. Knight. The defendant explained that on August 29, 1973, he had been drinking heavily and had left in a car with Danny Grizzle and Pat O'Connor. He stated that he had passed out on the backseat of the car. The defendant did not know how long they drove or where they went, but when he finally woke up, they were back at the apartment, O'Connor not being present. The defendant denied owning a gun.

The next witness testifying for the State was Irvin R. Box. In 1973, while working as a legal advisor to the Oklahoma City Police, Mr. Box interrogated the defendant and Danny Grizzle, after having given the *Miranda* warnings. The defendant told Mr. Box that on August 29, 1973, he and Danny Grizzle waited at the Sandpiper Apartments for Pat O'Connor. It was his understanding that when O'Connor arrived, the three men were going to another location so that Grizzle could sell O'Connor some marijuana. They left the apartment in O'Connor's car and traveled some distance into the country. When the car finally stopped, Grizzle pulled a revolver and forced O'Connor to empty his pockets. Grizzle directed the defendant to go through O'Connor's billfold, suspecting O'Connor was a narcotics agent. The defendant found no such identification, whereupon Grizzle ordered O'Connor out of the car and into a wooded area. The defendant heard two shots, and Grizzle came running back to the car proclaiming that he had shot O'Connor. The two men then drove to a Woolco Store purchased some cloth and wiped down the car to remove fingerprints. After abandoning the car and splitting the money taken from O'Connor between them, they returned to the Sandpiper Apartments.

After the statement of the defendants was taken, Grizzle was brought into the room. Mr. Box confronted the two men with contradictory statements. Finally Grizzle said "all right I shot him, but he ribbed me into it." When asked to explain,

Grizzle stated that while he and the defendant waited for O'Connor to arrive, they both decided it might be best to "blow him away," to prevent O'Connor from reporting them to the police. Grizzle then related subsequent events substantially as the defendant had. Mr. Box then asked the defendant if that is what had happened, and the defendant nodded and said that it was.

Officer Harold Neal, of the Oklahoma City Police Department, next testified that on October 31, 1973, he accompanied the defendant to the Canadian River Bridge on Meridian where the defendant pointed out O'Connor's billfold, which he and Grizzle had discarded. The billfold was recovered by Officer Neal. The defendant further directed Officer Neal to the area in which O'Connor's keys had been discarded, but the keys were not found.

Finally, Sgt. Larry K. Upchurch, another Oklahoma City Policeman, testified that on August 31, 1973, he recovered O'Connor's car after being directed to its location by Danny Grizzle.

The defense called seven witnesses, four of whom had lived at or had visited at Apartment No. 65 at the Sandpiper Apartments on August 29, 1973. All essentially corroborated the testimony of the previous residents of that apartment.

The defense called Kenneth Dodson in an attempt to introduce a voluntary statement made by Danny Grizzle while in the penitentiary. The statement however, was not admitted into evidence.

Detective Bill Hooten of the Oklahoma City Police Department testified that on August 31, 1973, he was present as Irvin Box interrogated the defendant. He substantially corroborated Box's testimony, except Hooten stated that the defendant denied suggesting that he and Grizzle "blow O'Connor away", and the defendant denied knowing that O'Connor was going to be robbed or killed.

The defendant then testified on his own behalf essentially corroborating the testimony of Detective Hooten. He stated that he had sold a gun to Grizzle two days before the murder.

■ In his first assignment of error, the defendant contends that the direct evidence at trial indicated that he had acted merely as an accessory after the fact, since his entire involvement with the crime occurred after the murder of Patrick O'Connor. Consequently, it is his position that the trial judge committed reversible error by failing to instruct on the alternative offense of accessory after the fact.

The Court notes that this question was answered in the recent case of *Wilson v. State*, Okl.Cr., 552 P.2d 1404 (1976), in which we stated that although the trial judge has the duty of instructing on all degrees of the principle crime warranted by the evidence, accessory after the fact is a separate and distinct crime and not a lesser included offense of the principle crime. However, we need not reach the merits of this assignment, as the defendant failed to request any instructions and thus waived his right to raise this issue on appeal. See, *Pierce v. State*, Okl.Cr., 495 P.2d 407 (1972).

■ The defendant next contends that the prosecutor in his closing argument to the jury prejudiced the defendant by stating misleading examples of aiding and abetting. We do not agree.

In Oklahoma, one who aids and abets the actual perpetrator of an offense is classified as a principal. See, 21 O.S.1971, § 172. To constitute aiding and abetting there must be participation in the offense by giving assistance, advice or encouragement at the time of the commission which is in furtherance of the common design. See, *Hall v. State*, Okl.Cr., 503 P.2d 229 (1972), and *Morrison v. State*, Okl.Cr., 518 P.2d 1279 (1974).

Looking at the State's summation as a whole, it is clear that the thrust of the special prosecutor's argument conveyed to the jury the idea that if the defendant helped plan and encourage perpetration of the murder, no direct acts by the defendant need have occurred during the homicide itself in order for him to be found guilty of murder. Furthermore, while some of the

isolated remarks made by the special prosecutor may have seemed incorrect, any prejudice was cured by the court's Seventh Instruction:

"You are instructed that aid and abet means to assist and supplement the efforts of another in the commission of a crime, with knowledge of the wrongful purpose of such other person, giving counsel and encouragement to such other person in the commission of such crime."

Therefore, it is clear that the jury was sufficiently apprised of the proper definition of aiding and abetting and was not mislead by the State's closing argument.

■ The defendant contends in his third assignment of error, that the prosecutor erred by referring to the defendant's conviction in a former trial. The statements to which the defendant objects were found in closing argument of the State:

"[T]here have been twelve other people just like yourselves that have listened to the same evidence and have found that man guilty of murder." Tr. 350 and, "[H]e's guilty of murder, just like twelve other jurors have found him guilty of this murder." Tr. 374.

While we agree with the defendant that once a new trial is granted, the former verdict cannot be used or referred to in evidence or in argument, see, 22 O.S.1971, § 951, and while such an action by a prosecutor is strongly condemned, the error in the instant case is not sufficient to warrant reversal.

In the case at bar the jury was aware from the beginning of the trial that a prior trial had been held. The testimony of six witnesses constituting in part the case for both the State and the defendant, was introduced into evidence by reading their testimony from the transcript of a former trial. Moreover, the defendant invited error by voluntarily interjecting the topic of the former trial into evidence during cross-examination.

"Q. You certainly don't know what Danny did at the fence company, do you?
"A. Yes, I know now. I believe you all brought it up at the last trial.

"Q. Oh. Well, let's stop right there a minute. What last trial? What are you talking about?
"A. I'm talking about the last trial I was at.
"Q. What last trial was this that you were at when we brought that up?
"A. Back in November when you all tried me for this.
"Q. Oh, you've been tried for this before, have you?
"A. Yes.
"Q. What happened?
"A. I was convicted." (Tr. 312, 313).

At that point the defendant objected and the court directed the jury to disregard the last question and answer from their consideration. Thus, any confusion created in the minds of the jurors as to what their duty was in regard to the former trial, was eliminated by the admonishment of the court. See, *Strong v. State*, 199 Miss. 17, 23 So.2d 750 (1945).

The defendant was apparently unconcerned about the prejudicial effect of this information for he failed to specifically request instructions limiting the effect of the disclosure now complained of. See, *Youngblood v. State*, 161 Ark. 144, 255 S.W. 572 (1923). Moreover, the defendant only contended that the State violated the prohibition against using the former verdict and failed to show how he was prejudiced by that information. See, *State v. Casey*, 338 S.W.2d 888 (Mo., 1960). Therefore, without finding prejudice and in the face of overwhelming evidence, see *Ellis v. State*, 87 Okl.Cr. 108, 194 P.2d 229 (1948), we find this assignment of error to be without merit. "In this case, we conclude that the 'minds of an average jury' would not have found the State's case significantly less persuasive had the" remarks as to the defendant's prior trial not been before the jury. *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972).

The defendant's fourth assignment of error is that the defendant was prejudiced by the introduction of evidence of other prior crimes for which the defendant was not

charged or convicted, elicited by the prosecutor during cross-examination and commented on in closing argument. These specific references to other crimes to which the defendant objects concerned the pawning of some tools which Grizzle had stolen, and a gun used by Grizzle as the murder weapon, which the defendant admitted stealing some weeks prior to the murder.

■ After a careful examination of the record, we note that the defendant's attorney failed to object to the testimony volunteered by the defendant concerning the crime of pawning stolen tools. Consequently, any error in the introduction of this evidence was waived. See, *Young v. State*, Okl.Cr., 531 P.2d 1403 (1975).

■ The evidence concerning the stolen gun was clearly opened by the defendant during the direct examination. The defendant stated that the gun which Danny Grizzle used as the murder weapon had belonged to him before he sold it to Grizzle, and that he brought the gun into Oklahoma from Texas. This Court stated in *Cherry v. State*, Okl.Cr., 544 P.2d 518 (1975):

> "When a defendant takes the witness stand he is considered a witness for all purposes and is subject to proper cross-examination upon all matters material to the issues involved. If he opens a certain subject for investigation on direct examination he cannot complain if questions are asked on cross-examination the answers to which would tend to modify his answers given in chief." (Citations omitted)

Once the defendant mentioned the ownership and transportation of the murder weapon, the prosecutor was free to attempt to gain more insight into those matters during cross-examination. Moreover, since the defendant on the stand had already admitted to several felony convictions, we fail to see how he could be prejudiced by the discussion concerning the murder weapon. Evidence concerning the gun was clearly relevant and thus we find no error.

■ As his fifth assignment of error, the defendant contends that his co-defendant,

Danny Grizzle's voluntary statement should have been admitted into evidence, so as to counteract the effect of the testimony of Irvin Box concerning Grizzle's implication of the defendant.

Clearly, the out of court statement, offered for the truth of the matter asserted, made by Danny Grizzle outside the presence of the defendant is hearsay. See, *Doyle v. State*, Okl.Cr., 511 P.2d 1133 (1973). Furthermore, reducing the statement to writing does not make it admissible. See, *Wing v. State*, Okl.Cr., 490 P.2d 1376 (1971). Danny Grizzle did not testify at trial in order to allow cross-examination by the state, and therefore, the trial court correctly excluded the written statement.

■ The oral statement affirming Danny Grizzle's statements made by the defendant as testified to by Irvin Box was admissible. This Court has held many times that statements voluntarily made by the accused whether in custody or not are admissible. See, *Fields v. State*, Okl.Cr., 284 P.2d 442 (1955), and *Davidson v. State*, Okl.Cr., 521 P.2d 1379 (1974). Moreover, the trial court in its Sixth Instruction informed the jury of its duty as to the voluntariness as to the defendant's statements:

> "If you believe from the evidence that the confession made by this defendant was made freely and voluntarily, within the rules of law set out above, then you may take such confession into consideration . . . However, if you find that the defendant was not informed and warned, as set out previously, or that there was any inducement held out to him, or threats of violence offered him to have him make the confession, and while acting under such circumstances he made it, or if it was made involuntarily, then you should not consider such alleged confession in arriving at your verdict."

Therefore, the defendant having voluntarily surrendered his right to remain silent agreed with Grizzle's statement of the facts, and the statement became admissible.

■ As his final assignment of error, the defendant urges that he should have been granted a preliminary hearing on the

second degree murder charge. The basis of the defendant's argument is that by amending the original information charging him with Murder in the First Degree, the issues were substantially altered, thus requiring that he be granted a second preliminary hearing examination.

We need not reach that argument. After having carefully examined the record, we fail to find a plea in abatement or a motion to quash the amended information, and thus the defendant waived his right to demand a preliminary hearing. See, *Martin v. State*, Okl.Cr., 463 P.2d 995 (1970), and *Hambrick v. State*, Okl.Cr., 535 P.2d 703 (1975).

For all of the above and foregoing reasons, the judgment and sentence appealed from is *AFFIRMED*.

BLISS and BRETT, JJ., concur.