Janet M. SANDERS/MILLER, Petitioner-Appellant,

v.

Ted LOGAN, Warden, Mabel Bassett Correctional Center and The State of Oklahoma, et al., Respondents-Appellees.

No. 80–2123.

United States Court of Appeals, Tenth Circuit.

June 13, 1983.

David J. Gottlieb, Lawrence, Kan., for petitioner-appellant.

Robert A. Nance, Asst. Atty. Gen., Chief, Federal Div., Oklahoma City, Okl. (Jan Eric Cartwright, Atty. Gen. of Oklahoma, and Danny K. Shadid, Asst. Atty. Gen., Oklahoma City, Okl., were on briefs), for respondents-appellees.

Before HOLLOWAY and McWILLIAMS, Circuit Judges, and TEMPLAR, District Judge.*

HOLLOWAY, Circuit Judge.

Petitioner-Appellant Janet Sanders[1] appeals from the judgment of the district court denying her *pro se* petition for a writ of habeas corpus submitted pursuant to 28 U.S.C. § 2254. After she perfected her appeal, this court appointed counsel. The controlling issue she raises is whether the evidence against her was sufficient for any rational trier of fact to find her guilty of first degree murder beyond a reasonable doubt, consistently with the mandates of the Due Process Clause of the Fourteenth Amendment as construed in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

The judgment in question was imposed by the District Court of Oklahoma County and affirmed by the Oklahoma Court of

---

* The Honorable George Templar of the United States District Court for the District of Kansas, sitting by designation.

1. The record indicates that Sanders has also been referred to as Janet Miller and Janet Sanders/Miller. Sanders and her co-defendant at trial, Billie Roger Miller, erroneously understood that they had entered into a common law marriage. (III R. 328–29; 386; 483). In fact, Miller had never obtained a divorce from his wife. For purposes of clarity we will refer to Appellant as Sanders.

Criminal Appeals. *Miller ·v. Oklahoma,* 560 P.2d 579 (Okla.Cr.App.1977).[2] Sanders argues that the statute under which she was convicted (*see* Part II, *infra* ) required proof that she shared a premeditated design to effect death with her co-defendant Miller, who actually did the killing, and that there was no evidence that she possessed such a mental state. The Warden and the State of Oklahoma (hereinafter the State) contend that the federal district court was correct in its view of substantive Oklahoma criminal law in regard to premeditated design, that under Oklahoma's aiding and abetting statute Sanders was properly convicted as a principal, and that proof of premeditated design to effect death was not "strictly necessary" to sustain her conviction on this basis. (Brief of Appellees at 9–10). The State further argues that from the circumstances it might be inferred that appellant Sanders knew of an intent on the part of Miller to kill the victim. (*Id.* at 13–14).

In this habeas suit the federal district court agreed with the State's position that Sanders's guilt could be established without proof that Sanders had a premeditated design to effect the victim's death. The court held that the evidence presented at trial "was more than sufficient to meet the standards set in *Jackson.*" (*Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). *Sanders/Miller v. Logan,* No. Civ.–80–692–E (W.D.Okla. 9/29/80, unpublished) (slip op. at 7). The petition for a writ of habeas corpus was therefore denied,[3] and this appeal followed.

We cannot agree with the State's argument, advanced without any convincing authorities, that there is no requirement of proof of premeditated design for one to be convicted as an aider and abettor to a murder in the first degree, under Oklahoma decisions under the statute in effect when this case arose. Instead we conclude that proof of Sanders's mental state was an essential element to be proved beyond a reasonable doubt; and proof was required that she have full knowledge of the intent of the person who committed the murder, in order to support her conviction as an aider and abettor to a first degree murder. *See* Part II, *infra.* After careful study of the record we must uphold the contention of appellant Sanders under *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2792, 61 L.Ed.2d 560 (1979), that the evidence, viewed in the light most favorable to the State, was clearly insufficient for any rational trier of fact to have found beyond a reasonable doubt that she possessed a premeditated design to effect death, or that as an aider and abettor she knew of Miller's intent to kill the victim.

I

We turn first to a review of the evidence underlying the challenged conviction of appellant Sanders.

Joyce Collins, the manager of a twenty-four hour "Time" convenience store (the store) in Midwest City, Oklahoma, was the fiancee of Billie Roger Miller, Sanders's co-defendant. Collins and Miller were together Sunday, February 23, 1975, until approxi-

---

**2.** Sanders was sentenced under 21 O.S.Supp. 1973 § 701.3 (repealed in 1976) which mandated capital punishment to every person convicted of murder in the first degree. The Supreme Court struck down mandatory death penalty statutes similar to that of Oklahoma. *See Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). In light of those decisions, the sentences for both Sanders and Miller were modified to life imprisonment in the opinion affirming their convictions. *Miller v. Oklahoma, supra,* 560 P.2d at 582; *and see Riggs v. Branch,* 554 P.2d 823, 827 (Okla.Cr.App.1976). Sanders's life sentence was commuted to a 45-year sentence in January 1981 by the Gover-

nor of Oklahoma on recommendation of the Pardon and Parole Board. She was granted a parole and release, under stated conditions, in April 1983. *See* Part V, *infra.*

**3.** We note that before the district court the State argued that the statute under which Sanders was convicted "was a codification of the common law felony murder rule as it had previously existed in Oklahoma," thus relieving the State from the burden of proving that Sanders had an intent to kill. (I R. 17–18). The district court's opinion did not adopt or discuss this argument, nor does the State rely on the contention in this court.

mately 9:30 p.m. During that time Collins twice mentioned to Miller that she needed to go to the store to pick up the weekend's receipts and deposit them in the bank. Both times Miller told Collins that she need not go to the store. The safe at the store contained close to two thousand dollars. Earlier the same weekend, Miller had called Collins at the store and told her that he had been laid off at work and that on Monday, February 24, he was going to Dallas to seek employment. (III R. 191–199).

Soon after leaving Collins, Miller went to the home of appellant Sanders and, at approximately 10:30 p.m., told her that he wanted to rob the convenience store. According to her statement,[4] Sanders insisted on accompanying Miller and Miller told her that, because it was a weekend, it was likely that there was a lot of money at the store.[5]

Sanders drove her own car when, at approximately 12:30 a.m. in the early morning of Monday, February 24, 1975, she and Miller left her house and went directly to the convenience store. Several people were in the store, however, and they drove past numerous times without stopping. Sometime between two and three a.m. the two stopped at the store and Miller went inside while Sanders stayed in the car. (III R. 219–20; State Exhs. 16 and 17). Inside, Miller found Louise Bensen working and Teena Barrett, one of the store's off-duty employees, visiting with Bensen while the two ate breakfast. According to Sanders, Miller went in the store "to see why Tina (sic) was still there . . . ." (See n. 5, supra).

There was evidence that Louise Bensen, Teena Barrett, and Miller all knew each

4. Neither Sanders nor Miller testified in their own behalf. After the State put on its case, defense counsel moved for a directed verdict and the motion was denied. (III R. 442). Defense counsel then waived its opening statement, called no witnesses, and rested. (III R. 443). Both Sanders and Miller signed handwritten statements which were admitted into evidence. (See III R. State Exhs. 16 and 17). The aggregate evidence as to Sanders's involvement in the murder is composed of her handwritten statement and testimony of the two Midwest City police officers that obtained the statements, one from Sanders and the other from Miller.

5. Sanders's statement is reproduced below in full. The symbol [ ] is used below and in note 7, infra, to indicate an elipsis where the declarants were required to initial changes or corrections in their statements.

At approximately 10:30 P.M. on Sunday Feb. 23 at my residence located at 1605 S.E. 60 Okla. City, Bill Miller mentioned to me that he wanted [ ] to rob the Time store in Midwest City. I said I wanted to go with him and he said he would rather I didn't. I insisted on going. Bill said there would probably be a lot of money at the store because it was a week-end (sic). At approximately 12:30 we left the house and went directly to the store. When we first arrived at the store there was (sic) several people there so we drove on by. I was driving [a] 1968 Buick owned by me. Bill was a passenger in the front seat. We went by the store several times. At approximately 2 A.M. I parked the car on the North side of the store and Bill went in and got a

Dr. Pepper, and I waited [ ] in the car. He went in to see why Tina (sic) was still there so late. He returned to the car and we drove around some more. At approximately 2:20 A.M. no one was at the store except the cashier. I parked the car on the north side of the store and Bill got out and [ ] went in. I drove around the block and came back. He got into the passenger side and said "let's go, I had to shoot her." We went down Douglas to 23rd and then went home. When we got home I took some tranquilers (sic) and layed (sic) down, I was sick. Bill counted the money and said there [ ] wasn't very much. Then he tried to calm me down.

At approximately 4:00 A.M. [ ] after I calmed down, we put some clothes in the car and headed for Dallas, Texas. We stopped and visited his aunt and uncle Monday morning in Dallas. Approximately 4:00 P.M. we stopped at a motel in Arlington and spent the night. When we awoke approximately 9:30 A.M. this morning we put our things in the car and came back.

We stopped in Ardmore and got a paper and learned that Bill was wanted. At this time we both decided to get rid of the gun. We drove to a Lake near Ardmore and Bill threw the gun into the lake. When [ ] we arrived in Pauls Valley, I put the money in a garbage can on the street. This was on the same street with the post office. We got back in the [ ] car and drove to a truck stop and Bill called the Midwest City Police Dept. We then drove home and Bill let me out and said he was going to the Midwest city police dept.

(III R. State Exh. 17).

other. Teena Barrett testified that Miller was in the store for about five minutes, during which time he purchased a soft drink, told Teena Barrett that he was on his way to Dallas, and conversed with Louise Bensen. Bensen also joked with Miller while he was in the store and in so doing, addressed him by his first name, Bill. (III R. 219–21).

Miller returned to the car and he and Sanders drove around until shortly after three a.m. when Teena Barrett had gone and Louise Bensen was alone in the store. (III R. State Exh. 16). Teena Barrett testified that she left Louise Bensen a few minutes after three a.m. (III R. 222). Sanders dropped Miller off at the store and drove around the block. (*See* n. 5, *supra*). When she returned, Miller got into the car and said "let's go, I had to shoot her." (*Id.*). Sanders responded "oh my God." (III R. 341 and State Exh. 16).[6]

Sanders and Miller then returned to Sanders's home where they packed clothes and prepared to leave for Dallas. According to Sanders's statement, before leaving for Dallas she took tranquilizers, laid down, and Miller "tried to calm [her] down." (*See* n. 5, *supra*). They left for Dallas around four a.m., "after [she] calmed down . . . ." (*Id.*). In Dallas they visited Miller's aunt

and uncle then spent the night in a motel in Arlington and, at approximately 9:30 a.m. on February 25, made their way back toward Oklahoma City.

On the way back to Oklahoma they learned from a newspaper account that Miller was being sought in connection with the murder. At that time they agreed to dispose of the gun and Miller threw it in a lake near Ardmore, Oklahoma.[7] In Pauls Valley, Oklahoma, Sanders placed the robbery money in a downtown streetside trash can.[8] Miller then called the Midwest City police department, spoke with an officer McNair, and told McNair he was on his way to the police department to talk with him. (III R. 344). Miller dropped Sanders off at her home and proceeded to the police department. Soon thereafter the police called Sanders, she was interviewed at the police station by an officer Thomason, and she wrote out her statement, *see* note 5, *supra*, in Thomason's office after verbally detailing to him the events of February 23 and 24. (III R. 338–39). Thomason's testimony describing Sanders's oral statements is consistent with her written statement. (*See* III R. 338–54). In addition, Thomason testified that on two separate occasions during the interview, Sanders became upset and cried. (III R. 339 and 341).

6. At approximately 3:30 a.m. Louise Bensen was found by store customers lying in a pool of blood behind the counter. (III R. 144–45). She had been shot five times at close range in the face and neck. (III R. 225–29).

7. Miller's statement, introduced into evidence, is generally consistent with the above scenario:

Bill R. Miller Aug 14th 1944 1605 S.E. 60th Valley Brook Jan [and] I left our house around 1:30 a.m. to test drive our Buick before leaving for Dallas, Tex. because she had told me earlier that something was wrong with it. After driving around for awhile we was (sic) over by the Time store. I noticed that Tina's (sic) car was still there [and] wondering why [and] also wanting a Dr. Pepper I stopped [and] went inside. I stayed inside for about 5 mins. This was around 3:00 a.m. I then [ ] went back to the car and drove away. I remembered that I was nearly out of cigarettes so I drove [ ] back to the Time store. Tina (sic) was gone when I got there. When (this was shortly after 3:00 a.m.) [ ] I went inside Louies (sic) [ ] asked

me what I was doing back so soon. I told her that I needed a pack of Camels. Next thing I can remember is that she was laying (sic) on her back bleeding from the face then the next thing I remember is walking fast back to the car. When I got inside the car Jan asked me what happened. I told [ ] her that I had shot Louies (sic) [and] her reply was oh my God. We pulled away from the store going North to 23rd somewhere I turned on to Western driving to SE 44th back to Eastern to 59th then to our house on 60th

On the way back from Dallas somewhere around Ardmore I stopped [and] threw the gun into a lake.
(III R. State Exh. 16).

8. The money was recovered and introduced into evidence but the gun was never found. (III R. 390–91; 441; and State Exh. 19). The money in the store safe proved to be untouched and a subsequent audit indicated that between $100.00 and $150.00 was missing from the store. (III R. 201). A bag containing $61.00 was recovered from the Pauls Valley trash can.

There was no direct or circumstantial evidence that Sanders was aware that Miller had a gun on the night of the robbery-homicide or that he owned a gun. Joyce Collins, Miller's fiancée and the manager of the store, testified that she had seen Miller with a handgun as recently as one week before the murder. Teena Barrett testified that Miller had told her that he carried a gun and had a permit to do so, but he had never shown her the gun. (III R. 198; 202; and 220–21).

This is the substance of the evidence in the state trial record, which has been made part of the record in this federal habeas proceeding. We consider now the legal sufficiency of that record to support Sanders's conviction under the *Jackson v. Virginia* standard.

## II

■ The State argues that Sanders mistakenly challenges the record for a fatal defect in not proving that Sanders had a premeditated design to effect the death of the victim. The State says that this element "is not strictly necessary to sustain" Sanders's conviction; that actually the State need not prove each element of the offense of first degree murder as to each defendant; and that by using the aiding and abetting statute—21 O.S.1971 § 172—the State may aggregate the elements supplied by one defendant or another to convict a defendant in the position of Sanders, without evidence that she shared the premeditated design of any other participant to effect the victim's death. The State says that this concept of aiding and abetting has "long been akin to that found in the felony murder statutes." (Brief of Appellees at 9–10, 12).

We must disagree. The State overlooks the fact that there was no felony murder provision in effect when this 1975 crime occurred. The argument the State advances confuses and misapplies concepts from the aiding and abetting statute, contrary to the plain provisions of the Oklahoma statutes and Oklahoma decisions. Those statutes and decisions do not support the position that aiding and abetting a robbery, with no knowledge of the intent that a murder be committed, may support a first degree murder conviction of the aider and abettor of the robbery.

A brief history of Oklahoma's murder statutes is in order. From territorial times until 1973, Oklahoma's death penalty statute included a felony murder provision under which a homicide resulting from the acts of a person engaged in the commission of any felony was murder and punishable, at the jury's discretion, by death or imprisonment for life at hard labor.[9] Thus, under that statute a homicide occurring during the commission of an armed robbery was a murder, regardless of the premeditated design or intention of the person or persons involved in the felony. Under *that* statute, a murder conviction of the driver of a getaway car, as a principal under the felony murder rule, was affirmed where an armed robbery and murder were committed by another party. *See, e.g., Lewis v. Oklahoma*, 451 P.2d 399, 400 (Okla.Cr.App.1967); *see also Oxendine v. Oklahoma*, 350 P.2d 606, 610–11 (Okla.Cr.App.1960); *Cornell v. Oklahoma*, 91 Okl.Cr. 175, 217 P.2d 528, 532 (Okla.Cr.App.1950). "The intent of the legislature in enacting [§ 701(3) ] was doubtless to class certain homicides as murder, without containing the ingredient of premeditated design or intention, which otherwise could not possibly be of a higher degree than manslaughter." *Morris v. Okla-*

---

**9.** 21 O.S.1971 §§ 701 and 707 (repealed in 1973) in pertinent part provided:

§ 701.
Homicide is murder in the following cases.
1. When perpetrated without authority of law, and with a premeditated design to effect the death of the person killed, or of any other human being.

    *     *     *     *     *     *

3. *When perpetrated without any design to effect death by a person engaged in the commission of any felony.*
§ 707.
  Every person convicted of murder shall suffer death, or imprisonment at hard labor in the State penitentiary for life, at the discretion of the jury. . . .
(Emphasis added).

*homa,* 68 Okl.Cr. 147, 96 P.2d 88, 93 (Okla. Cr.App.1939). Similarly, Oklahoma's present murder statute, in effect since 1976, contains a felony-murder section which permits a conviction of first degree murder punishable by death or life imprisonment, regardless of malice, when a life is taken during the commission of specific enumerated felonies.[10]

However, the critical point is that the statute under which Sanders was tried, convicted and sentenced for this 1975 offense did not contain a felony-murder provision. As appellant Sanders points out, the statute effective from May 17, 1973 through July 23, 1976, 21 O.S.Supp.1973, § 701.1, required a showing of "premeditated design to effect the death of the person killed" for every first degree murder conviction. The relevant portions of the statutes are set out below, and they include no felony murder provision:

§ 701.1 Murder in the first degree.—Homicide, when perpetrated without authority of law *and with a premeditated design to effect the death of the person killed, or of any other human being, is murder in the first degree* in the following cases:

\* \* \* \* \* \*

2. When perpetrated by one committing or attempting to commit rape, kidnapping for the purpose of extortion, arson in the first degree, *armed robbery* or when death occurs following the sexual molestation of a child under the age of sixteen (16) years . . . .

§ 701.3 Punishment for murder in the first degree—Instructions regarding lesser and included offenses.—Every person convicted of murder in the first degree shall suffer death.

(Emphasis added).

In construing this statute the Oklahoma courts consistently held that premeditated design was necessary for conviction on a

charge of first degree murder. *See, e.g., Provo v. Oklahoma,* 549 P.2d 354, 357 (Okla. Cr.App.1976); *Campbell v. Oklahoma,* 546 P.2d 276, 283 (Okla.Cr.App.1976); *and see Collins v. Oklahoma,* 561 P.2d 1373, 1378–79 (Okla.Cr.App.1977), *cert. denied,* 434 U.S. 906, 98 S.Ct. 306, 54 L.Ed.2d 193; *Clark v. Oklahoma,* 558 P.2d 674, 677 (Okla.Cr.App. 1977); *Sanders v. Oklahoma,* 556 P.2d 611, 613 (Okla.Cr.App.1976). In *Provo,* the Oklahoma court clearly identified the requirement of "premeditated design to effect death, a *necessary element to all categories of first degree murder as defined in 21 O.S.Supp.1974 § 701.1.*" 549 P.2d at 356. (Emphasis added).

In *Campbell, supra,* the court referred to the absence in the statutes of a provision addressing unpremeditated murders committed in perpetration of a felony as a "void in our law" and stated that "[a]s they now stand, *there is no section covering unpremeditated murder committed in conjunction with the felonies listed in 21 O.S.Supp. 1975 § 701.1.*" 546 P.2d at 283–84. (Emphasis added). Our research reveals no cases, nor do the parties cite any, in which the Oklahoma courts have upheld a first degree murder conviction under this statute where the defendant did not possess the requisite premeditated design to effect death. Moreover, the opinion of the Oklahoma court dealing with Sanders's direct appeal in no way made any departure from its prior holdings and did not overrule them. Hence the State's attempt to avoid the burden of proving the premeditated design element for a first degree murder conviction in this case fails.

Moreover, the State's argument that Sanders could be convicted of first degree murder as an aider and abettor, without knowledge that Miller intended to commit the murder, is fatally flawed. The Oklahoma case law is squarely to the contrary. The aider and abettor statute relied on has been on the books since 1910 and it was in

**10.** 21 O.S.Supp.1980, § 701.7(B) provides:

B. A person also commits the crime of murder in the first degree when he takes the life of a human being, *regardless of malice,* in the commission of forcible rape, robbery with a dangerous weapon, kidnapping, escape from lawful custody, first degree burglary or first degree arson.
(Emphasis added).

force at the time of this 1975 crime. *See* 21 O.S.1971 § 172 and legislative history there cited. The statute's construction is clear. In *Anglin v. Oklahoma,* 92 Okl.Cr. 430, 224 P.2d 272, 275 (Okla.Cr.App.1950) (quoting 14 Am.Jur. p. 826, Sec. 87), the court stated:

> To constitute a person a principal in a crime he must be present aiding by acts, words, or gestures and consenting to the commission of the crime. It is not necessary, however, that he do some act at the time in order to constitute him a principal, but he must encourage its commission by acts or gestures, either before or at the time of the commission of the offense, *with full knowledge of the intent of the persons who commit the offense.* The mere concurrence of the minds of persons in pursuance of a previously formed design to commit a crime does not alone constitute them principals. *To constitute a principal in crime, there must be participancy or the doing of some act at the time of the commission of the crime which is in furtherance of the common design.*

(Emphasis added).

It is thus clear that the aider and abettor must act with "full knowledge of the intent of the persons who commit the offense." The Oklahoma cases are legion applying this principle.[11] Moreover the instructions of the trial court in the state trial of appellant Sanders followed this same rule (II R. Instruction No. 4):

> You are instructed that "aid and abet" and "aiding and abetting" as used in these Instructions, means to assist and

supplement the efforts of another *in the commission of a crime, with knowledge of the wrongful purpose of such other person;* giving counsel and encouragement to such other person in the commission of *such crime.* (Emphasis added).

In sum, in order to uphold Sanders's conviction for first degree murder as an aider and abettor, there must be evidence that she participated in that crime, with full knowledge of Miller's intent to kill Louise Bensen. We are convinced that the Oklahoma Court in its opinion on Sanders's appeal, *Miller v. State,* 560 P.2d 579, in no way overruled its prior cases, which it has also applied since the *Miller* opinion,[12] and in no way held that such requirement of knowledge by the aider and abettor of the killer's intent to commit the murder was dispensed with. The effect of the Oklahoma court's judgment and its subsequent order denying rehearing, "after reviewing the record," was simply to hold that the evidence was sufficient under existing law. (II R. Order Denying Petition for Rehearing and Directing the Issuance of Mandate).

We must now consider whether, under the Supreme Court's standard, on this record any rational trier of fact could have found beyond a reasonable doubt that Sanders was guilty of first degree murder, as an aider and abettor with knowledge of Miller's intent to commit murder, as required by Oklahoma substantive law.

### III

■ The State argues that it is clear that Sanders wanted to join the robbery effort;

---

11. *E.g., Frazier v. Oklahoma,* 624 P.2d 84, 85–86 (Okla.Cr.App.1981); *Murray v. Oklahoma,* 562 P.2d 1157, 1160–61 (Okla.Cr.App.1977); *Morrison v. Oklahoma,* 518 P.2d 1279, 1281 (Okla.Cr.App.1974); *Hall v. Oklahoma,* 503 P.2d 229, 231 (Okla.Cr.App.1972); *Anderson v. Oklahoma,* 66 Okl.Cr. 291, 91 P.2d 794, 797–98 (Okla.Cr.App.1939) (collecting cases); *Polk v. Oklahoma,* 26 Okl.Cr. 283, 224 P. 194, 206 (Okla.Cr.App.1924); *Moore v. Oklahoma,* 4 Okl.Cr. 212, 111 P. 822, 824 (Okla.Cr.App. 1910).

12. We note that in *Frazier v. Oklahoma,* 624 P.2d 84, 85–86 (Okla.Cr.App.1981), the Oklahoma Court again cited *Anglin v. Oklahoma,* 94 Okl.Cr. 430, 224 P.2d 272 (Okla.Cr.App.1950),

which we have quoted above, requiring knowledge by the aider and abettor of the intent of the person committing the offense. The *Frazier* case emphasized the requirement of the defendant's knowledge, as an aider and abettor, and applied that requirement in reversing a conviction for insufficiency of the evidence. This *Frazier* case, decided *after* the direct appeal in *Miller,* which affirmed Sanders's conviction, demonstrates the unbroken application by the Oklahoma Court of the requirement of knowledge by the aider and abettor of the intent of the person committing the offense. *Murray v. Oklahoma,* 562 P.2d 1157, 1160–61 (Okla.Cr.App.1977), which is to the same effect, was also decided after *Miller.*

that codefendant Miller knew Teena Barrett; and that since Teena Barrett was in the store with Louise Bensen, the victim, when Miller first went in the store, it was imperative that Miller kill Bensen so that she could not identify him to the police through Teena Barrett after the robbery. The inference is drawn by the State that Sanders, knowing that Teena Barrett was acquainted with Miller, continued in her participation in the armed robbery, knowing that Louise Bensen must die. (Brief of Appellees at 13–14).[13]

The State's series of strained inferences drawn from Sanders's participation in the robbery is too tenuous to serve as support for the first degree murder conviction of Sanders beyond a reasonable doubt. After thorough study of the record, we are convinced that the evidence supports no more than the conclusion that Sanders aided and abetted a robbery, knowing that Miller would commit *that* offense. The record is devoid of evidence on which a rational trier of fact could find Sanders guilty of first degree murder beyond a reasonable doubt under the *Jackson v. Virginia* standard. Moreover a rational trier of fact could not find beyond a reasonable doubt that Sanders, as an aider and abettor, had "full knowledge of the intent of the persons who commit the [first degree murder] offense," *Anglin v. Oklahoma,* 94 Okl.Cr. 430, 224 P.2d 272, 275 (Okla.Cr.App.1950), in accord with Oklahoma substantive law.

There is no evidence in this record that Sanders knew of any intent by Miller to kill Louise Bensen or anyone during the robbery, or that any indication of such an intention was given to her by Miller. The State's notion that Sanders knew that Miller would kill Louise Bensen because of his acquaintance with Teena Barrett is untenable. In fact, the Supreme Court recently pointed out that statistics plainly do not support an inference that the victim of a robbery may be killed. *See Enmund v. Florida,* —— U.S. ——, —— at nn. 23 & 24, 102 S.Ct. 3368, 3378 at nn. 23 & 24, 73 L.Ed.2d 1140 (1982). The Supreme Court there cited studies showing that only about one-half of one per cent of robberies resulted in homicide, and the Supreme Court stated that the "most recent national crime statistics strongly support this conclusion." [14]

Furthermore, the circumstances shown in this record are equally or more susceptible to the inference that Sanders would not assume that Miller would kill someone he knew, or that there would be no need to kill Louise Bensen since, because of their acquaintance, she would not identify Miller to the police.[15] We note further that there is no evidence in the record that Sanders knew that codefendant Miller had a gun on the night of the robbery, or that he owned a gun.

In this connection, we note the observation in the dissent of Judge Brett concerning the lack of any evidence of Sanders's knowledge that Miller intended to kill Louise Bensen. The Judge concluded that "[n]ot only is the record in this case devoid of such evidence against Janet Sanders, such evidence as there is concerning her knowledge and intent is entirely to the contrary." 560 P.2d at 582. The evidence was that when Miller told Sanders he had shot Louise Bensen, Sanders exclaimed "Oh my

---

**13.** We note that there was some evidence that codefendant Miller knew the victim, Louise Bensen, in that she called Miller by his given name in the store. *See* Part I, *supra.*

**14.** From the F.B.I.'s Uniform Crime Reports for 1981, the figures show that only about .43% of robberies in the United States in 1980 resulted in homicide.

In addition, other studies indicate a high incidence of robbery among *non-strangers.* In 1979, there were an estimated 303,270 robberies of white females of which 27% were among

*non-strangers* and there were an estimated 65,-601 robberies of female blacks and other races, 15% of which were among *non-strangers. See* Flanagan, VanAlstyne, and Gottfredson, *Sourcebook of Criminal Justice Statistics—1981* 267 (1982).

**15.** In this connection, we note that there is no evidence in the record that Sanders was acquainted with Louise Bensen. In Sanders's statement, *see* n. 5, *supra,* she referred to Louise Bensen as "the cashier" and to Teena Barrett as "Tina".

God," and that she took tranquilizers and had to be "calmed down" by Miller before leaving for Dallas after the crime.[16]

In sum, the record does not support a rational finding, beyond a reasonable doubt, that Sanders committed a murder with premeditated design, or that as an aider and abettor she participated in such a crime with "full knowledge of the intent of the persons who commit the [first degree murder] offense," as required by Oklahoma substantive law. *Anglin v. Oklahoma*, 224 P.2d at 275. *See also Enmund v. Florida*, —— U.S. ——, ——, 102 S.Ct. at 3378.

## IV

■ As a secondary appellate argument for affirmance, the State claims that procedural defaults bar review of Sanders's claim. (Brief of Appellees at 16–19). First, it says that her claim is actually "a belated attack on the jury instructions under the guise of challenging the sufficiency of the evidence" and, citing *Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982) and *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the State claims that because Sanders failed to object to the instructions as given she cannot now challenge them. Second, again citing *Wainwright v. Sykes, supra,* the State claims that habeas relief is not available because Sanders "never properly presented this claim before the Oklahoma Court of Criminal Appeals" which omission constitutes "deliberate procedural default

and deliberate bypass. . . ." (Brief of Appellees at 19).

The arguments are unconvincing. First, we find nothing in the records before the state or federal courts to indicate that Sanders complains about the instructions. Indeed, Sanders has argued that the instructions support her position. (*See* Brief for Appellant at 27–28 and Reply Brief for Appellant at 7–8). There is no sound explanation why we should transform Sanders's straightforward challenge to the evidence under *Jackson v. Virginia* into an attack on the jury instructions. Instead we consider the issue as Sanders herself made her constitutional claim in the federal district court. She clearly presents it to this court as a constitutional claim that no rational trier of the facts could find her guilty, beyond a reasonable doubt, of first degree murder on this record, consistently with the Due Process Clause and the Supreme Court's ruling in *Jackson v. Virginia.*

■ Nor do we find that Sanders bypassed available state procedures.[17] In their joint petition in error on their direct appeal, Sanders and Miller stated that one error, among others, was that "[t]he verdict was not substantiated by sufficient evidence." (II R. Petition in Error). It is true that their brief to the Court of Criminal Appeals did not argue the sufficiency of the evidence issue and the majority opinion did not discuss it. In his dissent Judge Brett noted that the sufficiency issue was not

**16.** The reliability of this excited utterance is supported by Rule 803(2), F.R.E. The rule recognizes the hearsay exception for statements relating to a startling event made while the declarant was under the stress of excitement caused by the event.

Oklahoma's excited utterance exception is essentially the same as that in Rule 803(2), F.R.E. Under the common law and past Oklahoma cases, this exception was occasionally considered part of the *res gestae, Price v. Oklahoma*, 1 Okl.Cr. 358, 98 P. 447, 450–51 (Okla.Cr.App.1908), *Jones v. Oklahoma*, 321 P.2d 432, 443 (Okla.Cr.App.1958), but under the new Oklahoma Evidence Code, effective October 1, 1978, the term *res gestae* is discarded and replaced by precise exceptions, among them being 12 O.S.1981 § 2803(2) (excited utterance). *See Assadollah v. Oklahoma*, 632 P.2d 1215,

1218 (Okla.Cr.App.1981). The key to the reliability of an excited utterance "is that the declarant must be speaking under stress or excitement and the excitement must be caused by the event or condition." F. Read, *Oklahoma Evidence Handbook* 226 (1979).

**17.** There is no problem in the instant habeas case about exhaustion of state remedies as required by 28 U.S.C. § 2254(b) and (c). We note that the State conceded exhaustion before the federal district court (I R. 17), and that that court held that Sanders had "exhausted the remedies available to her in state court, as required by 28 U.S.C. § 2254(b) and (c)." *Sanders/Miller v. Logan*, No. Civ.–80–692–E (W.D.Okla. 9/29/80, unpublished) (slip op. at 2).

briefed, but he nevertheless concluded that it was "so fundamental that it cannot be ignored" and that, while he would affirm the conviction of Miller, he would not affirm the conviction of Sanders "for the reason that the evidence is entirely insufficient to support her conviction of the crime of Murder in the First Degree." *Miller v. Oklahoma,* 560 P.2d 579, 582 (Okla.Cr.App. 1977). Judge Brett reasoned that the death penalty statute then in effect required a showing that the actor had the design to effect death, "that is, a specific intent to kill" and that as to an accomplice, "there must be a showing from which the jury could infer that his accomplice showed that specific intent to kill." He concluded that not only was the record devoid of such evidence against Sanders, but "such evidence as there is concerning her knowledge and intent is entirely to the contrary." 560 P.2d at 582.

In connection with the dissent, the appellant Sanders points to Rule 3.13(B) of the Rules of the Court of Criminal Appeals. The rule requires that before a dissenting opinion is filed, "it shall be submitted to the judges who concurred in the original opinion." [18] Moreover, a joint petition for rehearing was filed by Sanders and Miller in the Oklahoma Court of Criminal Appeals. This petition asserted that the "evidence was insufficient to sustain the verdict and specifically the evidence was insufficient to establish beyond a reasonable doubt that Janet M. Sanders ... had a premeditated

intent to effect the death of Louise Benson (sic)...." (II R. Petition for Rehearing at 1 and Brief on Petition for Rehearing at 10). In denying the petition for rehearing the two judges composing the majority stated in their order that "after full and fair consideration of Petition for Rehearing ... *and after reviewing the record in the case* ... said Petition for Rehearing ... is hereby DENIED." (II R. Order Denying Petition for Rehearing and Directing the Issuance of Mandate) (emphasis added).[19]

In these circumstances the order demonstrates that the disposition of the sufficiency claim was on the merits. And "if the state courts have entertained the federal constitutional claims on the merits in a subsequent proceeding ... the federal courts have no discretion to deny the applicant habeas relief to which [s]he is otherwise entitled" even if state procedures had been deliberately bypassed. *Lefkowitz v. Newsome,* 420 U.S. 283, 292 n. 9, 95 S.Ct. 886, 891 n. 9, 43 L.Ed.2d 196 (1975). "It would seem to follow necessarily that when there is no bypass of state appellate procedures, deliberate or otherwise, and the state courts entertained the federal claims on the merits, a federal habeas corpus court must also determine the merits of the applicant's claim." *Id.; and see Francis v. Henderson,* 425 U.S. 536, 542 n. 5, 96 S.Ct. 1708, 1711 n. 5, 48 L.Ed.2d 149 (1976); *Fay v. Noia,* 372 U.S. 391, 439, 83 S.Ct. 822, 849, 9 L.Ed.2d 837 (1963); *Bromley v. Crisp,* 561 F.2d 1351,

---

**18.** In full, Rule 3.13(B) provides (Title 22, Ch. 18, App.):

> B. Dissenting Opinions. If a dissenting opinion is written by a judge qualified to participate, before the dissenting opinion is filed it shall be submitted to the judges who concurred in the original opinion.

**19.** After denial of the petition for rehearing, Sanders raised the sufficiency issue in a *pro se* application for post-conviction relief before the district court of Oklahoma County pursuant to the Oklahoma Post-Conviction Procedure Act, 22 O.S.1971 §§ 1080 *et seq.* and the application was denied on November 6, 1978. (I R. 16). Sanders then appealed that denial to the Oklahoma Court of Criminal Appeals and the appeal was dismissed because only a petitioner may sign a *pro se* petition and Sanders's peti-

tion was signed by a lay assistant. Thereafter, Sanders raised the sufficiency issue before the Oklahoma Court of Criminal Appeals through a habeas corpus petition and the court denied the petition in an order filed on May 15, 1980, stating that the issue should have been raised in the original appeal and her failure to do so precluded her from raising it subsequently, citing 22 O.S.1971 § 1086.

Despite this statement about the issues which Sanders herself raised, we are convinced that the record shows that the Oklahoma Court did consider the issue on the merits in view of Judge Brett's dissent, the petition for rehearing which asserted the sufficiency issue, and the majority order denying the petition, "after reviewing the record in the case." (II R. Order Denying Petition for Rehearing and Directing the Issuance of Mandate).

1360 & n. 10 (10th Cir.), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 499; *Newman v. Henderson,* 539 F.2d 502, 504 (5th Cir.).

In sum, we conclude that there was no by-pass or procedural default by Sanders which bars our ruling on her constitutional claim on the merits, as we have done.

### V

■ For all the reasons stated earlier, we must hold that the first degree murder conviction of appellant Sanders cannot stand under the mandates of the Due Process Clause of the Fourteenth Amendment and the standard laid down by the Supreme Court in *Jackson v. Virginia.*

■ We are aware that since argument, on recommendation of the Pardon and Parole Board, the Governor of Oklahoma granted a parole to appellant Sanders on April 6, 1983, providing for her release, subject to certain specified rules and conditions of parole. These circumstances do not, however, moot this habeas suit or prevent the granting of other appropriate relief. *See Carafas v. LaVallee,* 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968); *Peyton v. Rowe,* 391 U.S. 54 (1968); *Rhodus v. Patterson,* 404 F.2d 890 (10th Cir.1968); *Sciberras v. United States,* 404 F.2d 247 (10th Cir.1968). As the Supreme Court noted in *Carafas,* 391 U.S. at 239, 88 S.Ct. at 1560, the habeas statutes provide that " '[t]he court shall ... dispose of the matter as law and justice require,' " (quoting 28 U.S.C. § 2243), and the 1966 amendments to the habeas corpus statute "seem specifically to contemplate the possibility of relief other than immediate release from physical custody." Accordingly the judgment denying relief is reversed and the case is remanded with directions that judgment be entered adjudging the first degree murder conviction of appellant Sanders void for constitutional infirmity under the Fourteenth Amendment, and affording any further relief which law and justice require on further consideration of the cause by the district court.

IT IS SO ORDERED.