**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 23 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

OSBALDO TORRES,

        Petitioner - Appellant,

    v.

MIKE MULLIN, Warden, Oklahoma
State Penitentiary,

        Respondent - Appellee.

No. 00-6334

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. CIV-99-155-R)**

---

Mark Henricksen (and Lanita Henricksen, with him on the briefs), Henricksen &
Henricksen Lawyers, Inc., El Reno, Oklahoma, for Petitioner - Appellant.

Jennifer B. Miller, Assistant Attorney General (and W. A. Drew Edmondson,
Attorney General, with her on the brief), Oklahoma City, Oklahoma, for
Respondent -Appellee.

---

Before **KELLY** , **HENRY** , and **MURPHY** , Circuit Judges.

---

**KELLY** , Circuit Judge.

An Oklahoma jury convicted Osbaldo Torres of two counts of first-degree murder with malice aforethought and one count of first-degree burglary. Mr. Torres received a sentence of twenty years' imprisonment on the burglary conviction and sentences of death on the two murder convictions. The Oklahoma Court of Criminal Appeals ("OCCA") affirmed his convictions and sentences. See Torres v. State, 962 P.2d 3 (Okla. Crim. App. 1998).

After exhausting his state post-conviction remedies, Mr. Torres filed a petition for habeas corpus pursuant to 28 U.S.C. § 2254. Mr. Torres's petition asserted twenty-six grounds for relief. The district court denied the petition, and Mr. Torres then sought to appeal to this court. He obtained a certificate of appealability on the following claims: (1) that the evidence is insufficient to support his convictions; (2) that the trial court erred in instructing the jury on the elements of aiding and abetting; (3) that the prosecution engaged in misconduct that warrants a new trial or, in the alternative, a new sentencing proceeding; (4) that the prosecution destroyed potentially exculpatory fingerprint samples; (5) that Mr. Torres's death sentence violates the Eighth Amendment because the trial court's instructions failed to direct the jury to give individualized consideration to Mr. Torres's involvement in the homicides; and (6) that he was entitled to an

evidentiary hearing. Although Mr. Torres attempts to raise other claims on which a COA was not granted, we do not consider them. We affirm. [1]

## Background

In July 1993, the District Attorney for Oklahoma County, Oklahoma filed an information charging Mr. Torres and Jorge Ochoa with the murder of Maria Yanez and Francisco Morales and the burglary of Ms. Yanez's and Mr. Morales' home in Oklahoma City. The prosecution's initial information set forth alternative murder charges. First, the information charged each defendant with murdering Ms. Yanez and Mr. Morales with malice aforethought, in violation of Okla. Stat. tit. 21, § 701.7(A). In the alternative, the information alleged that the defendants had committed felony murder, in violation of Okla. Stat. tit. 21, § 701.7(B). The initial information also alleged that the defendants had committed burglary in the first degree, in violation of Okla. Stat. tit. 21, § 1431.

In October 1995, the prosecution filed an amended information that omitted the felony murder charges. See State Ct. Rec. vol. II, at 338-42 (Second Amended Information, filed Oct. 5, 1995). The case proceeded to trial in the

---

[1] We DENY Mr Torres's Supplemental Request for an Expanded Certificate of Appealability and we also DENY his Motion to Hold This Case in Abeyance and to Permit Petitioner/Appellant's Counsel to Present a Second Post Conviction Motion in the Oklahoma State Courts.

District Court for Oklahoma County, but the judge declared a mistrial after the jury was unable to reach a verdict. In February and March 1996, the Oklahoma district court conducted a second trial. The jury convicted Mr. Torres and Mr. Ochoa of (1) two counts of first-degree murder with malice aforethought and (2) one count of first-degree burglary.

In its opinion in the direct appeal of Mr. Torres's convictions, the OCCA set forth the following explanation of the evidence presented to the jury during the second trial:

> During the early morning hours [2:40 a.m.] of July 12, 1993, Francisco Morales and his wife, Maria Yanez, were shot and killed in the bedroom of their Oklahoma City home. The sound of gunfire woke Yanez's daughter Christina, who was 14 years old in the summer of 1993. Christina called 911 and told the operator that she believed her step-father, Morales, may have been firing the gun. After hanging up the telephone, she looked out her bedroom door. A light was on in the living room; Christina saw two men. One man was wearing a white t-shirt and the other man was wearing a black t-shirt. Christina stated the man in the black t-shirt had something in his hand, but she did not know what it was. Christina initially denied knowing the two men, but eventually identified Ochoa as the man in the black t-shirt and Torres as the man in the white t-shirt.
> The shooting also awakened Christina's step-brother, Francisco, who was eleven years old in the summer of 1993. Francisco saw the man in the black t-shirt shoot his father. He could not identify the gunman.
> The police quickly responded to Christina's 911 call. While en route to the Yanez/Morales home, Officer Coats arrested Torres and Ochoa, who were walking together a short distance from the homicide. The men

were sweating and nervous, and Coats claimed he observed blood on the clothing of the men. Subsequent tests revealed the presence of blood on Torres' clothes.

Shortly before the shootings, Torres and Ochoa parked a car at a friend's house. A witness observed one of the men take a gun from the trunk of the car and put it in his pants. The gun was different from the gun used in the murders. The witness stated one of the men was Ochoa. She could not identify the other man, but asserted the other man—and not Ochoa—put the gun in his pants. Another witness also testified that Ochoa and another man parked the car at the friend's house. This witness testified that Ochoa was the driver of the car. The witness also identified Torres as the man with Ochoa, although she was somewhat inconsistent in her identification, and she stated the passenger was wearing a white t-shirt.

Torres, 962 P.2d at 8. The prosecution "proceeded under the theory that Torres aided and abetted in the commission of the crimes and that Ochoa was most likely the triggerman." Torres, 962 P.2d at 15.

After the jury convicted Mr. Torres and Mr. Ochoa, the prosecution presented evidence in support of the death penalty. As to Mr. Torres, the prosecution argued that there were two aggravating circumstances: (1) that it was probable that Mr. Torres would commit criminal acts of violence that would constitute a continuing threat to society and (2) that Mr. Torres knowingly created a great risk of death to more than one person. As to the former, the prosecution invoked the circumstances of the murders, Mr. Torres's membership in a local gang, and an unadjudicated burglary committed when Mr. Torres was a juvenile.

In mitigation, the defense presented Mr. Torres's personal history and pleas of mercy from his family.

As to Mr. Torres, the jury found the existence of both aggravating circumstances and imposed the death penalty for the murder convictions. Mr. Ochoa also received the death penalty. See Ochoa v. State, 963 P.2d 583 (Okla. Ct. Crim. App. 1998). As to the burglary conviction, both Mr. Torres and Mr. Ochoa received sentences of twenty years' imprisonment.

Discussion

Because Mr. Torres filed his § 2254 habeas petition in the federal district court on June 30, 1999, well after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we consider Mr. Torres's petition under the standards set forth in the provisions of 28 U.S.C. § 2254(d) and (e), as amended by AEDPA.[2] See Moore v. Gibson, 195 F.3d 1152, 1160-61 (10th Cir. 1999). Section 2254(d) provides that an application for a writ of habeas corpus filed by a state prisoner:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>     (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

_____

[2] AEDPA became effective on April 24, 1996.

established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Section 2254(e)(1) adds that, in federal habeas proceedings filed by state prisoners, determinations of factual issues by state courts are presumed correct. The petitioner has the burden of rebutting this presumption of correctness by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court provided guidance as to when a state court decision may be deemed "contrary to" or "an unreasonable application of" established Supreme Court precedent pursuant to section 2254(d)(1). As to the former term, the Court explained that a state court decision is "contrary to" the Court's clearly established precedent in two circumstances: (1) when "the state court applies a rule that contradicts the governing law set forth in [the Court's] cases"; and (2) when "the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from" the result reached by the Supreme Court. Williams, 529 U.S. at 405-06. As to the latter term, the Court explained that a state court decision constitutes an unreasonable application of Supreme Court precedent if "the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that

principle to the facts of the prisoner's case." Id. at 413. Thus, "[u]nder §

2254(d)(1)'s "unreasonable application' clause, . . . a federal habeas court may

not issue the writ simply because that court concludes in its independent judgment

that the relevant state-court decision applied clearly established federal law

erroneously or incorrectly. Rather, that application must also be unreasonable."

Id. at 411; see also Thomas v. Gibson, 218 F.3d 1213, 1219-20 (10th Cir. 2000)

(discussing Williams).

### I. Sufficiency of the Evidence

Mr. Torres challenges the sufficiency of the evidence on two general

grounds. First, as to his murder convictions, he argues that the prosecution failed

to prove beyond a reasonable doubt that he intended to kill either Ms. Yanez or

Mr. Morales. Second, Mr. Torres argues that, as to both the murder and burglary

convictions, the evidence presented by the prosecution at trial is insufficient to

prove beyond a reasonable doubt that he participated in either crime.

### A. Standard of Review

A challenge to the sufficiency of the evidence may be raised in a federal

habeas corpus proceeding filed by a state prisoner pursuant to 28 U.S.C. §

2254(d). In such proceedings, the appropriate inquiry is

> whether, after viewing the evidence in the light most favorable to the
> prosecution, any rational trier of fact could have found the essential
> elements of the crime beyond a reasonable doubt. This familiar
> standard gives full play to the responsibility of the trier of fact fairly

> to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

Jackson v. Virginia, 443 U.S. 307, 319 (1979) (internal citations omitted).  The inquiry is based upon the entire record and the reasoning process actually used by the trier of fact, known or not, is not considered.  Id. at 319 n.13 ("The question of whether the evidence is constitutionally sufficient is of course wholly unrelated to the question of how rationally the verdict was actually reached.").

The amendments to the habeas corpus statutes set forth in AEDPA have added an additional degree of deference to state courts' resolution of sufficiency of the evidence questions.  See Valdez v. Ward, 219 F.3d 1222, 1237 (10th Cir. 2000) (noting that, if a state court has addressed a sufficiency of the evidence claim, the federal court's review in a habeas proceeding is governed by § 2254(d)).  However, in this circuit, there is some debate as to whether a claim challenging the sufficiency of the evidence under the AEDPA should be treated as a question of law or as a question of fact.  See Moore v. Gibson, 195 F.3d 1152, 1176-77 (10th Cir. 1999) (summarizing the split in the case law).

In this instance, we conclude for several reasons that Mr. Torres' challenge to the sufficiency of the evidence is properly viewed as a legal question.  First, in advancing this argument, Mr. Torres does not contend that the OCCA's factual findings are erroneous.  Instead he argues that the court's ultimate conclusion—that the evidence is sufficient to support his murder and burglary

-9-

convictions— constitutes an unreasonable application of <u>Jackson</u>. <u>See</u> Aplt. Br. at 51.[3] Moreover, the respondent has accepted this characterization of the issue. <u>See</u> Aplee. Br. at 26-31 (stating that the district court "found [the OCCA's] determination [that the evidence was sufficient] was not contrary to nor an unreasonable application of established law" and arguing in support of that conclusion); <u>cf.</u> <u>Mitchell v. Gibson</u>, 262 F.3d 1036, 1050 n.6 (10th Cir. 2001) (noting that "[t]he state in this appeal views the matter as one of law for purposes of review under AEDPA and to the extent necessary we do so as well") (internal citation omitted). Finally, treating Mr. Torres's sufficiency of the evidence argument as raising a legal question comports with the approach of other circuits. <u>See, e.g.</u>, <u>Wiggins v. Corcoran</u>, 288 F.3d 629, 636 (4th Cir. 2002) (reviewing the grant of a habeas claim based on insufficiency of the evidence and stating "we must decide for ourselves whether the Maryland Court of Appeals unreasonably applied clearly established federal law as determined by the Supreme Court");

---

[3] Even though the OCCA did not cite <u>Jackson</u>, we note, as does the respondent, that Oklahoma has adopted the <u>Jackson</u> standard for assessing the sufficiency of the evidence. <u>See</u> Aplee. Br. at 28 (citing <u>Spuehler v. State</u>, 709 P.2d 202, 203-04 (Okla. Ct. Crim. App. 1985)); <u>cf.</u> <u>United States ex rel. Jordan v. Bosse</u>, 41 F. Supp. 2d 812, 816 n.3 (N.D. Ill. 1999) (noting that the state appellate court did not cite <u>Jackson</u>, but analyzing a habeas claim based on alleged insufficiency of the evidence by considering whether the state court's decision constituted an unreasonable application of the <u>Jackson</u> standard). We therefore view the OCCA's conclusion regarding the sufficiency of the evidence as an application of <u>Jackson</u>.

-10-

Piaskowski v. Bett, 256 F.3d 687, 691-95 (7th Cir. 2001) (reviewing a state court decision to determine whether that court's conclusion that the evidence was sufficient constituted an unreasonable application of Jackson).

B. Oklahoma Law Regarding Malice Murder and Aiding and Abetting

In considering the OCCA's application of the Jackson sufficiency of the evidence standard, we apply Oklahoma law regarding the substantive elements of the offense. See Wingfield v. Massie, 122 F.3d 1329, 1332-34 (10th Cir. 1997) (applying Oklahoma law in habeas action challenging the sufficiency of the evidence); Sanders/Miller v. Logan, 710 F.2d 645, 650-54 (10th Cir. 1983) (same). In the state court proceedings at issue here, Mr. Torres was convicted of two counts of murder in the first degree with malice aforethought, violations of Okla. Stat. tit. 21, § 701.7(A). Section 701.7(A) provides:

> A person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof.

Oklahoma law also provides that persons who aid and abet in the commission of a crime may be convicted as principals. See Okla. Stat. tit. 21, § 172 (stating that persons "concerned in the commission of crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals").

-11-

As we noted in Wingfield , the OCCA has held that in order to convict an aider and abetter as a principal in a malice murder prosecution under Okla. Stat. tit. 21, § 701.7A, the prosecution must prove the following elements: (1) that the defendant personally intended the death of the victim; and (2) that the defendant aided and abetted with full knowledge of the perpetrator's intent. Wingfield , 122 F.3d at 1332 (citing Johnson v. State , 928 P.2d 309, 315 (Okla. Ct. Crim. App. 1996)); see also Torres , 962 P.2d at 15 (stating these same elements). Additionally, under Oklahoma law, a defendant charged under an aiding and abetting theory may only be convicted if he or she engages in "'acts, words or gestures encouraging the commission of the offense, either before or at the time of the offense.'" Wingfield , 122 F.3d at 1332 (quoting VanWoundenberg v. State , 720 P.2d 328, 333 (Okla. Ct. Crim. App. 1986)). Moreover, "'mere mental assent to or acquiescence in the commission of a crime by one who did not procure or advise its perpetration, who takes no part therein, gives no counsel and utters no word of encouragement to the perpetrator, however wrong morally, does not in law constitute such person a participant in the crime.'" Id. (quoting Turner v. State , 477 P.2d 76, 83 (Okla. Ct. Crim. App. 1970)). Still, "only slight participation is needed to change a person's status from mere spectator into an aider and abetter." Spears v. State , 900 P.2d 431, 438 (Okla. Ct. Crim. App. 1995).

Applying these precepts to challenges by habeas petitioners, this circuit has reached different conclusions as to whether the evidence supported a rational juror's inference that the petitioner intended the death of the victims. The different conclusions may be explained by different facts. In Wingfield, 122 F.3d at 1333-34, we concluded that there was sufficient evidence from which a reasonable juror could have inferred that the defendant personally intended the death of the victim. We relied upon evidence tending to show that the defendant had stated an intent to kill the victim, the defendant directed the victim to the killer, and the defendant showed no remorse and helped dispose of the victim's body. Id. at 1333. Therefore, we reversed the federal district court's grant of the writ. In contrast, in Sanders/Miller, 710 F.2d at 652-54, we concluded that the habeas petitioner was entitled to relief and thus reversed the district court's denial of a habeas petition, reasoning that "the evidence supports no more than the conclusion that the defendant aided and abetted a robbery, knowing that [the robber] would commit *that* offense." Id. at 653. There was no evidence in the record that the defendant knew that the robber had a gun on the night of the robbery or owned a gun. Id. Further, the evidence indicated that the defendant expressed shock when she learned the robber had shot the victim and had to be calmed before fleeing. Id. at 653-54.

We have also offered the following guideposts:

Although "[t]he meaning of the word 'intent' in the criminal law has always been rather obscure," there are a few guideposts we can rely upon in our present inquiry. First, a jury is permitted to draw inferences of subjective intent from a defendant's objective acts. Thus, even when a defendant, as here, denies having the requisite intent, a jury may disbelieve the defendant "if [the defendant's] words and acts in the light of all the circumstances make [the defendant's] explanation seem improbable." Second, a jury is permitted to find that a defendant intends those consequences which he announces a desire to accomplish.

Wingfield , 122 F.3d at 1333 (quoting 1 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 3.5, at 302, 318 (1986) (other internal citations omitted)).

C. Evidence of Mr. Torres's Intent

Mr. Torres argues that, under the Oklahoma law concerning the elements of first degree malice murder and aiding and abetting, the prosecution's evidence is insufficient to establish that he intended the death of Ms. Yanez and Mr. Morales. According to Mr. Torres, "not one single witness could testify to a single action of [Mr. Torres] which resulted in the death of the victims, either as perpetrator, or as aider and abettor." Aplt. Br. at 57. Mr. Torres notes that, although the evidence arguably supports the inference that his codefendant Mr. Ochoa shot the victims, the prosecution identified no evidence that Mr. Torres shared the intent to kill the victims or that Mr. Torres aided and abetted Mr. Ochoa in the murders. See id. at 51-60.

-14-

In rejecting that argument on direct appeal, the OCCA set forth the following evidence supporting the prosecution's theory:

> Torres and Ochoa parked a car a few blocks from the Yanez/Morales home shortly before the murders. One witness identified Ochoa as one of the men in the car. She could not identify the other man but stated that that other man took a gun from the trunk of the car and put the gun in his waist band. The gun was not a Tech-9, which was the gun used in the killings. Christina Yanez testified that after hearing a number of gunshots and after she called 911, she looked out into the living room and saw Torres and Ochoa standing together. Christina testified that Ochoa was holding something in his hand, but she could not identify what it was. Torres and Ochoa were talking and moving back and forth. Both men were arrested together shortly after the killings and only a few blocks away from the killings. Torres had blood on his clothing which was consistent with his blood, Ochoa's blood and victim Morales' blood. A footprint consistent with Torres' footprint was found a short distance from the Yanez/Morales home. The front door of the Yanez/Morales house looked like it had been kicked in.

Torres , 962 P.2d at 15-16.

From that evidence, the OCCA stated, the following inferences could be drawn by a rational juror:

> Obviously, Torres illegally entered the Yanez/Morales home with Ochoa. Torres was more than merely present at the crime scene. The circumstantial evidence supports a finding of intent, particularly given the evidence that Torres had a gun with him prior to the killings and that he illegally entered the Yanez/Morales home.

-15-

Id. at 16.  The OCCA thus concluded that the evidence supported the inference that Mr. Torres intended the death of Ms. Yanez and Mr. Morales, and the court therefore rejected Mr. Torres' challenge to the sufficiency of the evidence.  In this appeal, the respondent contends that this analysis was not an unreasonable application of established law.    See Aplee. Br. at 26-31.

In considering the OCCA's analysis, we begin with the two "guideposts" for assessing evidence of intent that we identified in      Wingfield , 122 F.3d at 1333.  As we stated there, a jury may infer intent from Mr. Torres' objective acts and may also infer that a defendant intended "the consequences which he announce[ed] a desire to accomplish."     Id.

Consideration of the second guidepost is straightforward:  unlike the record in Wingfield  and Johnson v. State, 928 P.2d 309, 315 (Okla. Ct. Crim. App. 1996), the record here contains no evidence that Mr. Torres expressed a desire to injure or kill the victims.    See Wingfield , 122 F.3d at 1333.   Although the prosecution sought to introduce evidence of Mr. Torres' gang affiliation, thereby suggesting that the killings were gang-related, the trial court granted a pretrial motion in limine excluding this evidence from the guilt phase.  Thus, the jury had no evidence that Mr. Torres expressed a desire to harm the victims.

As to the other guidepost we identified in     Wingfield —the aider and abettor's objective acts—we read the OCCA's analysis as concluding that a

rational juror could have concluded beyond a reasonable doubt that Mr. Torres engaged in the following conduct: (1) accompanied by Mr. Ochoa, exited a parked car a few blocks from the Yanez/Morales home shortly before the murders; (2) removed a gun (though not the Tech 9 gun used in the murders) from the trunk of the car and put it in his waist band; (3) accompanied by Mr. Ochoa, broke into the Yanez/Morales residence at 2:40 a.m.; (4) after the shootings, talked to Mr. Ochoa and moved back and forth in the house; [4] and (5) shortly after the killings, left the Yanez/Morales residence accompanied by Mr. Ochoa and was arrested only a few blocks away from the site of the murders.

The OCCA also referred to certain items of physical evidence. Mr. Torres had blood on his clothing which was consistent with his blood, Mr. Ochoa's blood, and the victim Mr. Morales's blood. Also, a footprint consistent with Mr. Torres's footprint was found a short distance from the Yanez/Morales home. See Torres, 962 P.2d at 15-16.

This evidence is susceptible to interpretation. On the one hand, as the prosecution has vigorously argued, one could view this evidence as indicating that Mr. Torres and Mr. Ochoa jointly formulated a plan to murder Ms. Yanez and Mr.

---

[4] Our review of Christina Yanez's testimony indicates that she reported: (1) seeing the two men "moving back and forth I guess to the door and back" and (2) observing them whispering to each other, but that she could not hear what they were saying. Rec. Tr. Trans. vol. III, at 238-39.

Morales. Alternatively, one could conclude that Mr. Torres and Mr. Ochoa jointly planned to burglarize the residence but that, once they entered the house, Mr. Ochoa acted impulsively by shooting the victims, though this theory is somewhat belied by the forensic pathologist's testimony that Mr. Morales and Ms. Yanez were each shot at least nine times. Rec. Tr. Trans. vol. VII, at 132, 136. One could also conclude that Mr. Torres and Mr. Ochoa had different motives, with Mr. Torres intending a burglary while Mr. Ochoa, unbeknownst to Mr. Torres, intended to kill Ms. Yanez and/or Mr. Morales. Under Jackson and the Oklahoma law regarding malice murder and aiding and abetting, the prosecution did not have the burden of proving that its suggested scenario—a joint plan to murder—was the only possible alternative. However the prosecution did have the burden of presenting evidence from which a rational juror could conclude—beyond a reasonable doubt—that Mr. Torres had the requisite intent to kill the victims.

Notwithstanding the lack of evidence on an announced intent by Mr. Torres to kill the victims, our review of the record does suggest that a rational juror certainly could conclude that Mr. Torres had the requisite intent to kill. At 2:40 a.m., Mr. Torres accompanied Mr. Ochoa, who was armed with a semiautomatic weapon, to the residence. Mr. Torres also was armed with a weapon and entered through a door that had been kicked down, all of which suggests anticipation of a

-18-

confrontation. The victims were shot repeatedly, between nine and twelve times, with seven of the shots fired at each victim being fatal. Rec. Tr. Tran. vol. III at 133, 136. Although there was time to rob the victims after the homicides, Mr. Torres (and Mr. Ochoa) walked back and forth in the house. Ms. Yanez's purse was taken, but money and personal property were found on the victims, suggesting an intent to kill, rather than merely to rob. [5] Mr. Torres and Mr. Ochoa conversed in whispers after the murders, rather than indicating surprise or taking more property. Also, Mr. Torres had blood on his shirt and was well acquainted with Mr. Ochoa.

D. Application of Jackson

As is apparent from the foregoing, we cannot conclude that the OCCA's application of Jackson v. Virginia was objectively unreasonable. See Bell v. Cone, 122 S. Ct. 1843, 1850 (2002) (a state court's unreasonable application of federal law must be objectively unreasonable, not merely incorrect); Williams , 529 U.S. at 412. Mr. Torres' challenge is directed at the reasoning that led the OCCA to find sufficient evidence to support his murder convictions under the

---

[5] After the murders, the police officers discovered a wallet containing $300 in cash in the waistband of Mr. Morales' shorts and jewelry on the body of Ms. Yanez. All that was taken from the residence was a purse, even though Mr. Ochoa and Mr. Torres lingered in the residence after the killings and thus could have taken more property (and probably would have) if their only intent was to burglarize the residence.

Jackson standard.  Although a state court's reasoning does matter, ultimately, it is the reasonableness of the outcome that is paramount.  As stated by the Second Circuit:

> Although sound reasoning will enhance the likelihood that a state court's ruling will be determined to be a "reasonable application" of Supreme Court law, deficient reasoning will not preclude AEDPA deference, at least in the absence of an analysis so flawed as to undermine confidence that the constitutional claim has been fairly adjudicated.

Cruz v. Miller, 255 F.3d 77, 87 (2d Cir. 2001) (citations omitted).

The OCCA reviewed the evidence presented by the prosecution, see Torres, 962 P.2d at 15-16, and found it sufficient.  Although our discussion of intent includes additional evidence contained in the record, that in no way diminishes the deference we pay to the OCCA's result–after all, what matters is that the evidence support the OCCA's result.  In a footnote, the OCCA also rejected Mr. Torres' argument that the facts of his case were analogous to two cases in which the evidence of intent to kill the victim was insufficient.  See id. at 16 n. 40 (citing Sanders/Miller, 710 F.2d at 646-47 (10th Cir. 1983), and Anderson v. State, 91 P.2d 794 (Okla. Ct. Crim. App. 1939), and stating that "in [those cases] the courts found there was no evidence to support premeditated design to kill").  The OCCA then stated: "Here, [Mr.] Torres' actions can support a finding of intent as discussed in Johnson v. State, 928 P.2d 309, 315 (Okla Ct. Crim. App. 1996)."

-20-

Johnson contains ample evidence of both announced intentions and objective acts demonstrating an intent to kill that we discussed in Wingfield. See 122 F.3d at 1333. As noted, this case does not contain evidence of announced intentions by Mr. Torres to kill the victims. But we do not think that the OCCA meant to support its result in this case by analogizing to the facts of Johnson. Rather, having set forth the evidence, it is more plausible that the OCCA intended to incorporate the fuller exposition of the requisite intent contained in Johnson. Regardless, even if the citation of Johnson was ambitious, we are concerned with the outcome of the sufficiency issue as to intent–and that outcome is not an unreasonable application of federal law.

E. Sufficiency of the Evidence Supporting the Burglary Conviction

Mr. Torres also advances a more general challenge: he argues that the evidence is insufficient to allow a reasonable juror to conclude beyond a reasonable doubt that he broke into the Yanez/Morales home unlawfully and that, as a result, his petition should be granted as to both his murder and his burglary convictions. The State had to prove "(1) breaking, (2) entering, (3) a dwelling, (4) of another, (5) in which a human is present, (6) with the intent to commit some crime therein." See Calhoun v. State, 820 P.2d 819, 821 (Okla. Ct. Crim. App. 1991); Okla. Stat., tit. 21, § 1431 (first degree burglary). In support of his argument, Mr. Torres observes that one of the witnesses who observed the two

men getting out of a car near the residence on the morning of the murders was unable to identify either man. He adds that, during her trial testimony, another witness mistook Mr. Torres for Mr. Ochoa.

Again, the OCCA's analysis did not constitute an unreasonable application of Jackson. Christina Yanez identified Mr. Torres as one of the men she saw in the residence at the time of the murders. Even though Ms. Yanez did not identify the two men when she was first interrogated by Oklahoma City police officers, the jury was entitled to find her identification testimony at trial to be credible, particularly in light of the fear and trauma that she may have experienced in the period immediately following the murders. In light of Ms. Yanez's testimony, and all the other evidence in the record, the OCCA's conclusion that the evidence was sufficient to support Mr. Torres's burglary conviction was not an unreasonable application of Jackson.

## II. Jury Instructions

The next issue is whether the jury was properly instructed that, in order to find Mr. Torres guilty of those charges, the prosecution was required to prove that Mr. Torres (1) "personally intended the death of the victim and (2) aided and abetted with full knowledge of the intent of the perpetrator." Torres, 962 P.2d at 16.

The jury was instructed on the law of aiding and abetting. Instruction 11 informed the jury that "[a] person concerned in the commission of a crime as a principal is one who directly and actively commits the acts constituting the offense, knowingly and with criminal intent aids and abets in the commission of the offense, or who advises and encourages the commission of the offense." St. Ct. Rec. vol. II, at 513 (instr. no. 11). The following instruction added:

> One who does not actively commit the offense, but who aids, promotes, or encourages its commission, either by act or counsel or both, is not deemed to be a principal to the crime unless he did what he did knowingly and with criminal intent. To aid or abet another in the commission of a crime implies a consciousness of guilt in instigating, encouraging, promoting, or aiding in the commission of that criminal offense.

Id. at 514 (instr. no. 12).

The jury instructions also set forth the elements of malice murder. Instruction 4 informed the jury that "[n]o person may be convicted of such Murder in the First Degree," unless the state proves: (1) "the death of a human"; (2) "the death was unlawful"; (3) "the death was caused by the defendants"; and (4) "the death was caused with malice aforethought." Id. at 506. Instruction 5 proceeded to define malice aforethought as "deliberate intention to take away the life of a human being" and adds that malice aforethought does not mean "hatred, spite or ill-will." Id. at 507. Instruction 6 again provided that "[n]o person may be convicted of Murder in the First Degree unless his conduct caused the death of

-23-

the person allegedly killed." Id. at 508. Finally, the jury was instructed that it must consider the case of each defendant separately. Id. at 515 (instr. no. 13).

The OCCA concluded that, when read as a whole, the instructions properly required a finding that Mr. Torres acted with the intent to kill the victims. In particular, the OCCA held that its earlier decision in Johnson v. State, 928 P.2d 309, 315-16 (Okla. Ct. Crim. App. 1996), was controlling:

> Like Torres, the appellant in Johnson complained that the trial court erred in using the Oklahoma Uniform Instructions on aiding and abetting in a first degree malice murder case. Like Torres, Johnson argued the instructions allowed the jury to replace a general intent with a specific intent to kill thus lessening or changing the State's burden of proof. The Johnson Court rejected this argument finding that these instructions in conjunction with the instructions on first degree murder properly set out Oklahoma law and channeled the jury's discretion.

Torres, 968 P.2d at 16. Similarly, the district court relying upon Instructions 4, 5, 11 and 12 concluded that the jury was instructed adequately on the intent required for malice murder, and rejected the argument that the instructions were deficient because they did not adequately distinguish between malice murder and first degree burglary. We have addressed similar challenges before and conclude that the OCCA's resolution was neither contrary to, nor an unreasonable application of federal law, particularly given our deferential review of jury instructions on collateral attack. See Cupp v. Naughten, 414, U.S. 141, 146 (1973); Cannon v. Gibson, 259 F.3d 1253, 1269-71 (10th Cir. 2001); Johnson v. Gibson, 254 F.3d 1155, 1162-63 (10th Cir. 2001).

Although Cannon and Johnson involved single-defendant trials, both involved another defendant whom the defendant was accused of aiding and abetting, so it is difficult to see how the danger of imputed intent is any greater in this case. In any event, we are not persuaded that the instructions when read reasonably and as a whole, would allow the jury to impute a finding of malice aforethought from one defendant to another, from Mr. Ochoa to Mr. Torres. As we have noted, the jury instructions concerning the requirements of malice murder were prefaced with "no person," i.e. singular, language, and the jury was instructed that it must consider each defendant's case separately.

### III. Prosecutorial Misconduct Claim

Mr. Torres contends that the prosecution engaged in misconduct that deprived him of a fair trial. In support of his claim, Mr. Torres alleges that the prosecution engaged in the following improprieties: (1) attempted to impeach a witness with testimony taken in a prior trial in which the jury was unable to reach a verdict; (2) alluded to Mr. Torres's alleged gang affiliation; (3) made various improper comments during the trial and in closing argument, see, e.g., Torres, 962 P.2d at 17-18 (discussing some of the comments) and (4) pressured a witness to testify falsely.

We begin with Mr. Torres' argument that his specific constitutional right to the presumption of innocence was violated by the prosecutor's rhetorical question

asking "Do you think we're trying to prosecute somebody that's innocent?" Torres, 962 P.2d at 17. He also contends that the prosecutor's rhetorical question about lack of any evidence indicating remorse infringed upon the privilege against self-incrimination. Rec. Tr. Trans. vol. X, at 296. Where prosecutorial misconduct directly affects a specific constitutional right such as the presumption of innocence or privilege against self-incrimination, a habeas petitioner need not establish that the entire trial was rendered unfair, but rather that the constitutional guarantee was so prejudiced that it effectively amounted to a denial of that right. See Paxton v. Ward, 199 F.3d 1197, 1217-18 (10th Cir. 1999) (showing that the misconduct had a "substantial prejudicial effect" on the right warranted relief); Mahorney v. Wallman, 917 F.2d 469, 473 (10th Cir. 1990). The OCCA recognized that the remark quoted above "impermissibly treaded on Torres' presumption of innocence," but held that this comment "did not affect the verdict and relief is not warranted." Torres, 962 P.2d at 17-18. Though the quoted rhetorical question was improper, we agree that it did not so prejudice the presumption of innocence as to result in a denial of that right and the prosecutor's comment on the lack of evidence of remorse hardly resulted in a denial of the privilege against self-incrimination.

We have also considered the remaining catalogue of allegedly improper comments and actions by the prosecutor urged by Mr. Torres on appeal in support

of the first three grounds. In order to be entitled to relief on a claim that prosecutorial misconduct has violated his right to due process, a habeas petitioner must establish that the prosecutor's misconduct was "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 483 U.S. 756, 765 (1987) (internal quotation marks omitted); see also Donnelly v. De Christoforo, 416 U.S. 637, 643 (1974). The offending remark or action must be placed in the context of the whole trial, and not viewed in isolation. Greer, 483 U.S. at 765-66. Considered collectively and in the context of the trial as a whole, the remaining remarks and conduct in the remaining grounds did not render Mr. Torres' trial fundamentally unfair.

Mr. Torres argues that even if the prosecutorial misconduct did not have a "substantial and injurious effect or influence in determining the jury's verdict" and did not result in "actual prejudice," Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), he is still entitled to relief based upon the "footnote-nine exception" to harmless error in Brecht, 507 U.S. at 638 n.9. [6] We recently discussed the

---

[6] That exception provides:

Our holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict. We, of course, are not presented with such a situation here.

(continued...)

-27-

parameters of this very narrow exception in Duckett v. Mullin, 306 F.3d 982, 992-93 (10th Cir. 2002). Although the same prosecutor was involved in this case as in Duckett, we cannot conclude that the prosecutorial misconduct complained of so infected the public integrity of the proceedings as to warrant habeas relief.

As to the fourth instance of alleged misconduct—that the prosecution pressured a witness to testify falsely, we agree with the district court that the claim is procedurally barred. Mr. Torres' argument is based on an affidavit of Maria Calderon. [7] The OCCA determined that the claims concerning Ms. Calderon could have been raised on direct appeal, but were not, and they did not support a conclusion that the outcome of the trial would have been different or that the defendant was factually innocent. Rec. vol. I, doc. 15, app. 2, at 4 n.13.

---

[6](...continued)
Brecht, 507 U.S. at 638 n.9 (citation omitted).

[7] In this affidavit, Ms. Calderon explains that she testified at trial that, on the morning of the murders, she saw the man accompanying Mr. Ochoa "put a small gun in his belt." Rec. doc. 15, App. 3 (Appendix to Petition for a Writ of Habeas Corpus). She adds that "[i]n fact I did not and do not now recognize that object to have been a gun of any kind. It was assuredly not a Tech-9, but I cannot in fact say that it was a gun at all." According to Ms. Calderon's affidavit, she testified that she saw a gun only because an Assistant District Attorney who interviewed her before the trial told her that, in a prior interview, Ms. Calderon had stated that she had seen a gun and that she "would go to jail if I did not say this." Id.

Our review of the record indicates that Ms. Calderon's affidavit was signed on April 10, 1997, during the pendency of Mr. Torres's direct appeal. [8] Thus, the district court properly concluded that the claim arising out of Ms. Calderon's affidavit "could have been but was not raised on direct appeal." Rec. vol. I, doc. 27, at 18 (District Court Mem. Op. and Order, filed Aug. 23, 2000). As a result, Mr. Torres is not entitled to raise this claim unless he can show either (a) cause for the procedural default and resulting prejudice or (b) that a fundamental miscarriage of justice will result if the court does not consider the claim. See Coleman v. Thompson, 501 U.S. 722, 749-50 (1991).

We agree with the district court that Mr. Torres has failed to make this showing. In this regard, we recognize that Ms. Calderon's affidavit constitutes a modification of her trial testimony at the first and second trials that an unidentified individual she saw with Mr. Ochoa on the morning of the murders put a small gun in his belt. She now cannot identify the object. At both trials, however, Ms. Calderon's somewhat inconsistent testimony about the gun, its characteristics and the origins of that testimony were subject to adequate cross-examination and impeachment and the jury was left to sort it out. Rec. vol. I,

---

[8] The OCCA did not issue its opinion in the direct appeal until June 30, 1998, more than a year after Ms. Calderon signed this affidavit.

doc. 15, app. 17, at 40-41, 46-47, 52-53; Tr. Trans. vol. III at 215-16; see also Tapia v. Tansy, 926 F.2d 1554, 1563 (10th Cir. 1991).

[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976). Mr. Torres has failed to establish that the prosecutor knowingly presented false testimony at the second trial, let alone that the testimony was false. See Van Woundenberg v. Gibson, 211 F.3d 560, 569 (10th Cir. 2000); Romano v. Gibson, 239 F.3d 1156, 1175 (10th Cir. 2001). On the latter point, Ms. Calderon's affidavit does not contradict the substantial remainder of her testimony, its corroboration, or the other facts of the crime. The gun in question was not the murder weapon. Mr. Torres accompanied Mr. Ochoa in breaking down a locked residential door at 2:40 a.m., while Mr. Ochoa was armed with a semiautomatic weapon. The victims were fired upon repeatedly. Rather than leaving promptly, Mr. Torres and Mr. Ochoa remained in the home, yet only a purse was taken. With or without the testimony about the precise nature of the object Mr. Torres placed in his belt, we conclude that Mr. Torres cannot demonstrate prejudice as there is no reasonable likelihood that the testimony on this comparatively small point could have affected the judgment of the jury when considered against the overwhelming evidence of guilt.

## IV. Destruction of Evidence Claim

Mr. Torres argues that the prosecution violated his due process rights by destroying latent fingerprints obtained at the Yanez/Morales residence after the murders. Here, Mr. Torres focuses on the trial testimony of Oklahoma City Police Department Investigator Charles Goforth. Mr. Goforth testified that he had obtained some latent fingerprints at the residence. However, Mr. Goforth further explained that these prints were "smears" and thus were of no evidentiary value. Rec. Tr. Trans. vol. VI, at 147. As a result, he destroyed them.

In support of his argument, Mr. Torres focuses on Mr. Goforth's statement that some of the latent fingerprints that he destroyed contained faint ridges and that a single ridge could contain a single point of dissimilarity that would allow a fingerprint expert to exclude an individual as having left that print. Mr. Goforth also admitted that he never attempted a comparison between the prints he obtained and the prints of the residents of the house, the victims, or the defendants.

As noted by the district court and the OCCA, the destruction of potentially useful evidence by the police does not constitute a due process violation unless the petitioner can show that the destruction of evidence was accomplished in bad faith. See Arizona v. Youngblood, 488 U.S. 51, 58 (1988). Here, the OCCA's conclusion that Mr. Torres failed to establish bad faith, see Torres, 962 P.2d at

13, was not unreasonable. Moreover, as the district court observed, Mr. Torres also failed to establish that the fingerprint evidence was even potentially exculpatory:

> Simply because a point of dissimilarity on ridges might show that a fingerprint was not [Mr. Torres's] would not make the exculpatory value of a fingerprint smudge apparent given that several people lived in the victims' home and anyone who visited the home may also have left his or her fingerprints on objects in the home.

Rec. vol. I, doc. 27, at 14-15 (District Ct. Mem. Op. and Order, filed Aug. 23, 2000).

Accordingly, Mr. Torres is not entitled to relief on his due process claim arising out of the destruction of latent fingerprints.

## V. Eighth Amendment Claim

Mr. Torres argues that his death sentence violates the Eighth Amendment because the trial court's instructions failed to direct the jury to give individualized consideration to Mr. Torres's involvement in the homicides. The Eighth Amendment does not permit imposition of a death sentence upon a defendant who did not "himself kill, attempt to kill, or intend that a killing take place or that lethal force be employed," Enmund v. Florida 458 U.S. 782, 797 (1982), or unless that defendant was a major participant in the underlying felony and acted with a "reckless indifference to human life," Tison v. Arizona, 481 U.S. 137, 158 (1987). This case does not involve felony murder--the Oklahoma

County District Attorney's Office dismissed the felony murder charges against Mr. Torres, and tried him on malice murder counts. Having concluded that the jury instructions adequately instructed the jury on these counts, we must conclude that the OCCA's similar rejection of this Eighth Amendment claim was not an unreasonable application of federal law. See Torres, 962 P.2d at 20-21; see also Cannon v. Gibson, 259 F.3d 1253, 1279 n.26 (10th Cir. 2001).

## VI. Evidentiary Hearing

Because Mr. Torres' claims are capable of resolution on the record, the district court did not abuse its discretion in denying him an evidentiary hearing. See Miller v. Champion, 161 F.3d 1249, 1252-53 (10th Cir. 1998).

AFFIRMED.

No. 00-6334,   Torres v. Mullin

**HENRY** , Circuit Judge, concurring in part and dissenting in part,

I agree with the majority that the evidence is sufficient to support Mr. Torres's burglary conviction and that Mr. Torres is not entitled to habeas relief on his claims for prosecutorial misconduct and destruction of evidence.

As to Mr. Torres's challenge to the sufficiency of the evidence supporting his murder convictions, I would reach the same result as the majority—that Mr. Torres is not entitled to habeas relief—but I would do so for a different reason. Unlike the majority, I do not believe that the evidence is sufficient to support Mr. Torres's murder convictions. However, I cannot conclude that the Oklahoma Court of Criminal Appeals' decision to the contrary constitutes an unreasonable application of federal law such that Mr. Torres is entitled to habeas relief.

In contrast, as to Mr. Torres's challenge to the jury instructions, I conclude that he is entitled to habeas relief. In my view, the jury was not properly informed that it was required to find that Mr. Torres intended to kill the victims, as required by Oklahoma law.     The Court of Criminal Appeals' rejection of this claim constitutes an unreasonable application of federal law. I would hold that, as to the murder convictions, Mr. Torres is entitled to habeas relief on that ground, and I would allow the state of Oklahoma to retry him before a properly instructed jury.

## A. Sufficiency of the Evidence

The majority concludes that "the record does suggest that a rational juror certainly could conclude that Mr. Torres had the requisite intent to kill." Op. at 18. In support of that conclusion, the majority relies on the following evidence: (1) Mr. Torres and Mr. Ochoa were seen carrying guns near the murder scene; (2) the door of the Yanez/Morales residence had been kicked down; (3) the children of the murder victims identified Mr. Torres and Mr. Ochoa as the two men who broke into the residence; (4) the victims were shot repeatedly; (5) "[a]lthough there was time to rob the victims after the homicides, Mr. Torres (and Mr. Ochoa) walked back and forth in the house;" op. at 19; (6) "Ms. Yanez's purse was taken, but money and personal property were found on the victims, suggesting an intent to kill, rather than merely to rob," id.; (7) "Mr. Torres and Mr. Ochoa conversed in whispers after the murders, rather than indicating surprise or taking more property;" id.; (8) when observed by police after the murders, Mr. Torres had blood on his shirt; (9) Mr. Torres was "well acquainted" with Mr. Ochoa. Id.

Although I agree that this evidence provides support for the prosecution's contention that Mr. Torres intended to kill the victims, I do not believe that this evidence allows a rational juror to "reach a subjective state of near certitude," see Jackson v. Virginia, 443 U.S. at 307, 315 (1979) (defining the beyond-a-reasonable-doubt standard), on that issue.

-2-

In my view, there are two key gaps in the prosecution's case against Mr. Torres for malice murder. First, there is no direct evidence of Mr. Torres's motive. Second, the prosecution did not present any direct evidence of Mr. Torres's role in the shooting. In light of the testimony of Mr. Morales's son—that he saw a man in a dark shirt shooting his father—the prosecution's theory was that Mr. Ochoa was the shooter. The prosecution was unable to present testimony as to the conduct of another person inside the residence before or during the shooting.

Although the evidence cited by the majority does support the conclusion that Mr. Torres broke into the residence and fled after Mr. Ochoa shot the victims, those two key gaps in the prosecution's case foreclose a rational juror's finding beyond a reasonable doubt that Mr. Torres intended to kill the victims. In this regard, I note that a number of courts have deemed evidence resembling that on which the majority here relies insufficient to establish an intent to kill. [1]

---

[1] See, e.g., United States v. Randolph, 93 F.3d 656, 664 (9th Cir. 1996) (vacating conviction under the federal carjacking statute, 18 U.S.C. § 2119, and concluding that "brandishing a semiautomatic weapon, without more, does not support an inference of . . . the specific intent to kill or to inflict serious bodily harm"), abrogated on other grounds by Holloway v. United States, 526 U.S. 2 (1999); United States v. Andrews, 75 F.3d 552, 555 (9th Cir. 1996) (reversing a conviction for aiding and abetting in a murder even though the defendant brought a rifle to the crime scene because the defendant did not "in any . . . obvious way assist . . . in shooting the victims" and because there was no evidence that the defendant shared the intent to hurt the victims); United States v. Salamanca, 990

(continued...)

In spite of this deficiency in the evidence, however, Mr. Torres faces an extremely high hurdle in seeking habeas relief on his sufficiency of the evidence claim: he must establish not merely that the Court of Criminal Appeals' conclusion is incorrect but also that the court's conclusion constitutes an unreasonable application of the standard announced by the Supreme Court in Jackson, 443 U.S. at 319. See Williams, 529 U.S. at 412 (stating that "an unreasonable application of federal law is different from an incorrect or erroneous application of federal law") (emphasis in original).

---

[1](...continued)
F.2d 629, 639 (D.C. Cir. 1993) (concluding that evidence that one defendant aided an abetted in an assault with the intent to kill was insufficient in part because "there is nothing in the record about [that defendant's] behavior after the assault that indicates [that] he was a participant in any way during the assault"); id. (stating that "[w]e do not mean to suggest that flight is irrelevant as an indicator of guilt . . . . [b]ut in the circumstances of this case, there is nothing in [the defendant's] flight that evinces guilt of aiding and abetting as opposed to acting as an accessory after the fact."); id. at 640 (noting that "the presence of blood on the [defendant's] shirt is not necessarily indicative of proximity during the attack" and "[the defendant] could well have gotten the blood on his shirt after the attack" and therefore concluding that the evidence was insufficient to sustain a conviction for aiding and abetting an assault with the intent to kill); Sanders/Miller v. Logan, 710 F.2d at 645, 653 (10th Cir. 1983) (concluding that the prosecution's "series of strained inferences drawn from [the defendant's] participation in the robbery is too tenuous to serve as support for the first degree murder conviction of [the defendant] beyond a reasonable doubt").

-4-

Although there is not an extensive body of case law distinguishing an unreasonable application of Jackson from one that is merely incorrect, several recent circuit decisions have identified factors relevant to this inquiry. First, "the failure of the state court to consider at all a key argument of the defendant may indicate that [the state court's] conclusion is objectively unreasonable." Hurtado v. Tucker, 245 F.3d 7, 18 (1st Cir. 2001). "[T]he failure . . . to give appropriate weight to all of the evidence" may also indicate an unreasonable decision. Id.; see also Piaskowski v. Bett, 256 F.3d 687, 694 (7th Cir. 2001) (concluding that the state court unreasonably applied Jackson because the court found that the defendant "kicked and beat [the murder victim]" despite the fact that "the record was devoid of any direct evidence" of such an act and because "the available circumstantial evidence at most cast[] suspicion on [the defendant]"). Finally, "the reasoning used by the state court is . . . pertinent." Hurtado, 245 F.3d at 20 (citing Williams, 529 U.S. at 391-98). However, "the paucity of reasoning employed by the state court does not itself establish that its result is objectively unreasonable." Hurtado, 245 F.3d at 18. The ultimate question . . . is . . . whether the outcome is reasonable." Id. at 20.

Here, in considering Mr. Torres's challenge to the sufficiency of the evidence that he intended to kill the victims, the Court of Criminal Appeals reviewed the evidence presented by the prosecution, see Torres, 962 P.2d at 15-

16, and then rejected Mr. Torres's argument that the facts of his case were analogous to two cases in which the evidence of intent to kill the victim was insufficient. See id. at 16 n. 40 (citing Sanders/Miller, 710 F.2d at 646-47 (10th Cir. 1983), and Anderson v. State, 91 P.2d 794 (Okla. Crim. App. 1939), and stating that "in [those cases] the courts found there was no evidence to support premeditated design to kill"). The court then stated: "Here, [Mr.] Torres' actions can support a finding of intent as discussed in Johnson v. State, 928 P.2d 309, 315 (Okla Crim. App. 1996)."

To me, the court's reliance on Johnson is troubling. That case contains the very kind of evidence of announced intention that we discussed in Wingfield v. Massie, 122 F.3d 1329, 1332-34 (10th Cir. 1997). See maj. op. at 11-14 (discussing Wingfield); Wingfield, 122 F.3d at 1333 (stating that a jury may infer that the defendant "intends those consequences which he announces a desire to accomplish"). In Johnson, the Court of Criminal Appeals noted that, "[i]n the space of three days [, the defendant] foretold how and why [the victim] would be killed, [the defendant] told tenants he could take care of the problems [the victim] caused," and, "while [the victim] was being attacked [, the defendant] or [his accomplice] told [the victim] the precise reason, articulated earlier by [the defendant,] for the attack." Johnson, 929 P.2d at 315. Characterizing this

-6-

evidence, the court continued: " <u>There is no doubt whatsoever that this [defendant] personally intended that [the victim] die.</u> " <u>Id.</u> (emphasis added).

Moreover, the record in <u>Johnson</u> also contained evidence concerning the manner in which the defendant assisted in the homicide. The victim, who lived for seventeen hours after the attack, told police officers that the defendant hit him over the head with a baseball bat while another man poured gasoline on him from a plastic jug and set him on fire. <u>See id.</u> at 313.

Here, the evidence that Mr. Torres intended the death of the victims is not nearly as strong as the evidence against the defendant in <u>Johnson</u>, particularly since the prosecution did not present direct evidence that Mr. Torres assisted in the homicides. Nevertheless, I cannot conclude under our deferential standard of review that the Court of Criminal Appeals application of the <u>Jackson</u> standard is unreasonable. Sufficiency of the evidence determinations are made by assessing the totality of the circumstances in the individual case. As a result, Mr. Torres cannot point to a body of case law clearly establishing that the particular set of facts presented by the prosecution here is insufficient to establish an intent to kill. As the majority notes, there is considerable evidence suggesting that Mr. Torres was involved in the killings. Although under a de novo standard of review, I would not conclude that this evidence is sufficient, I am convinced that the

Oklahoma Court of Criminal Appeals's conclusion to the contrary was not unreasonable.

C. Jury Instructions

I also disagree with the majority's analysis of the jury instructions. I acknowledge that a habeas petitioner such as Mr. Torres is only entitled to relief on this ground if the instructional error undermines the fundamental fairness of the trial. See Henderson v. Kibbe, 431 U.S. 145, 154 (1977); Cupp v. Naughten, 414 U.S. 141, 146-47 (1973). In my view, however, the instructions' failure to adequately inform the jury of a crucial element of malice murder under Oklahoma law does meet that standard.

As noted above, the Court of Criminal Appeals held that, in order to convict Mr. Torres of malice murder, the prosecution was required to prove that Mr. Torres (1) "personally intended the death of the victim[s] and (2) aided and abetted with full knowledge of the intent of the perpetrator." Torres, 962 P.2d at 15. In spite of that requirement, the instructions did not adequately inform the jury of the prosecution's burden of proving Mr. Torres's intent.

The jury did receive general instructions as to the law of aiding and abetting. Instruction 11 informs the jury that "[a] person concerned in the commission of a crime as a principal is one who directly and actively commits the acts constituting the offense, knowingly and with criminal intent aids and abets in

the commission of the offense, or who advises and encourages the commission of the offense." St. Ct. Rec. vol. II, at 513 (instr. no. 11). The following instruction adds:

> One who does not actively commit the offense, but who aids, promotes, or encourages its commission, either by act or counsel or both, is not deemed to be a principal to the crime unless he did what he did knowingly and with criminal intent. To aid or abet another in the commission of a crime implies a consciousness of guilt in instigating, encouraging, promoting, or aiding in the commission of that criminal offense.

Id. at 514 (instr. no. 12).

These aiding and abetting instructions thus refer to "criminal intent" and to the "consciousness of guilt in instigating, encouraging, promoting, or aiding" the offense. Id. at 513-14. They do not expressly refer to the need to find that the aider and abettor acted with the intent to kill the victims.

The jury instructions also set forth the elements of malice murder. Instruction 4 informs the jury that, in order to convict the defendants of that offense, the prosecution is required to prove: (1) "the death of a human"; (2) "the death was unlawful"; (3) "the death was caused by the defendants"; and (4) "the death was caused with malice aforethought." Id. at 506 (emphasis added). Instruction 5 proceeds to define malice aforethought as "deliberate intention to take away the life of a human being" and adds that malice aforethought does not mean "hatred, spite or ill-will." Id. at 507.

-9-

Like the aiding and abetting instructions, these instructions on the elements of malice murder are unclear as to the finding of intent required to convict Mr. Torres individually. One reasonable reading of these instructions is that the referenced "malice aforethought" is the malice aforethought of Mr. Ochoa rather than of Mr. Torres himself.

I do note that both the Oklahoma Court of Criminal Appeals and the federal district court concluded that, when read as a whole, the instructions properly required a finding that Mr. Torres acted with the intent to kill the victims. In particular, the Court of Criminal Appeals held that its earlier decision in Johnson v. State, 928 P.2d 309, 315-16 (Okla. Crim. App. 1996), was controlling:

> Like Torres, the appellant in Johnson complained that the trial court erred in using the Oklahoma Uniform Instructions on aiding and abetting in a first degree malice murder case. Like Torres, Johnson argued the instructions allowed the jury to replace a general intent with a specific intent to kill thus lessening or changing the State's burden of proof. The Johnson Court rejected this argument finding that these instructions in conjunction with the instructions on first degree murder properly set out Oklahoma law and channeled the jury's discretion.

Torres, 968 P.2d at 16.

Similarly, the federal district court concluded that, when read as a whole, the instructions properly informed the jury that, in order to convict Mr. Torres of malice murder, it was required to find that he acted with malice aforethought.

-10-

The district court pointed to instruction 4, which sets forth the elements of malice murder, and instruction 5, which defines malice aforethought.

Our court has addressed this issue in two recent habeas cases. Cannon v. Gibson, 259 F.3d 1253, 1269-71 (10th Cir. 2001) and Johnson v. Gibson, 254 F.3d 1155, 1162-63 (10th Cir. 2001). Both cases construe the instructions as a whole and find that the Oklahoma jury was properly instructed that it had to find that the defendant acted with intent to kill.

Importantly, however, in both cases, there were instructions that focused the jury on the intent of the individual defendant. Thus, in Cannon, the jury was informed that "[i]t is the burden of the State to prove beyond a reasonable doubt that the Defendant formed the specific criminal intent of the crime[] of Murder in the First Degree." Cannon, 259 F.3d at 1271 n.19. In Johnson, "the trial court specifically instructed jurors that the State had to prove beyond a reasonable doubt that Johnson 'formed the specific criminal intent of malice aforethought.'" Johnson, 254 F.3d at 1163 (quoting the relevant jury instruction). Additionally, in neither Cannon nor Johnson is there any indication that the trial court referred to "the defendants" collectively when it defined malice aforethought, as the trial court did here. Indeed, in both Cannon and Johnson, the trials at issue involved one defendant, not two. See Cannon, 259 F.3d at 1258 n.1 (noting that the defendant Cannon was initially tried with a codefendant but that the Oklahoma

-11-

Court of Criminal Appeals reversed his initial conviction on the grounds that he should have been tried separately); Johnson, 254 F.3d at 1158 (noting that "[t]he State tried Johnson and Masquat separately"). Thus, unlike the instant case, these cases did not present the risk that the jury could impute a finding of malice aforethought from one defendant to another.

I acknowledge that the jury did receive several other instructions that directed it to focus on the conduct of each defendant individually. In particular, instruction 6 informs the jury that "[n]o person may be convicted of Murder in the First Degree unless his conduct caused the death of the person allegedly killed." St. Ct. Rec. vol. II, at 508. Instruction 6 further specifies that "[a] death is caused by conduct if the conduct is a substantial factor in bringing about the death and the conduct is dangerous and threatens or destroys life." Id.

Similarly, instruction 13 informs the jury that the jury should "give separate consideration to the case of each individual defendant." Id. at 515. Instruction 13 also states that "[e]ach defendant is entitled to have his case decided on the basis of the evidence and the law which is applicable to him." Id.

However, despite these instructions, I do not believe that the jury was clearly informed that, in order to convict Mr. Torres of malice murder, the jury was required to determine that Mr. Torres "personally intended the death of the victim[s] and aided and abetted with full knowledge of the intent of the

-12-

perpetrator." Torres, 962 P.2d at 16 (internal quotation marks omitted). Finding that Mr. Torres's conduct "[wa]s a substantial factor in bringing about the death [of the victims]," St. Ct. Rec. vol. II, at 508 (instr. no. 6), is clearly not the same as finding that he intended the death of the victims. Instead, the finding required by instruction 6 resembles the finding necessary to support a conviction for felony murder, see Okla. Stat. tit. 21, § 701.7(B), rather than malice murder. Similarly, the instruction that the case against the defendants should be considered separately merely refers the jury to the other instructions—instructions that do not clearly inform the jury that the prosecution was required to prove Mr. Torres's intent to kill.

In light of the fact that Mr. Torres was tried jointly with Mr. Ochoa, it was crucial for the jury to understand that it could not convict Mr. Torres of malice murder unless he personally intended the death of the victims. Because these instructions did not so inform the jury, Mr. Torres is entitled to habeas relief.

## D. CONCLUSION

Many of the prosecution's difficulties in this case appear to have arisen out of its own strategic decision to dismiss the initial felony murder charge against Mr. Torres. Had the prosecution proceeded under a felony murder theory, it would not have been required to prove beyond a reasonable doubt that Mr. Torres

intended to kill the victims in order to obtain a conviction. <u>See</u> Okla. Stat. tit. 21 § 701.7(B); <u>Freeman v. State</u>, 876 P.2d 283, 287 (Okla. Crim. App. 1994) (discussing the elements of felony murder). [2] That determination would only be necessary during the sentencing phase of the trial.

The reason for the prosecution's dismissal of the felony murder charges is not clear on this record. At oral argument, counsel for the respondent suggested, unconvincingly, that the prosecution did not need to resort to the felony murder doctrine because the evidence of Mr. Torres's intent to kill was so strong. In contrast, Mr. Torres's counsel offered a more plausible explanation: that by dropping the felony murder theory and obtaining malice murder convictions, the prosecution was able ease its burden at the penalty phase. In particular, citing <u>Tison v. Arizona</u>, 481 U.S. 137 (1987) and <u>Enmund v. Florida</u>, 458 U.S. 782 (1982), Mr. Torres's counsel contended that, in light of the jury's apparent finding during the guilt phase that Mr. Torres intended to kill the victims, the prosecution was not required to argue that issue at the penalty phase, as it would have been if Mr. Torres had been convicted of felony murder. <u>See</u> <u>Fowler v.</u>

---

[2] Section 701.7(B) provides:
> A person also commits the crime of murder in the first degree, <u>regardless of malice</u>, when that person <u>or any other person</u> takes the life of a human being during, or if the death of a human being results from, the commission or attempted commission of . . . <u>first degree burglary</u>

Okla. Stat. tit. 21 § 701.7(B) (emphasis added).

-14-

<u>Ward</u>, 200 F.3d 1302, 1309 (10th Cir. 2000) (stating that <u>Enmund</u> and <u>Tison</u> "require that the jury give individualized consideration to the culpability of defendants prior to imposing the death penalty").

In any event, by forgoing the felony murder charges, the prosecution imposed upon itself the high burden of proving that Mr. Torres intended to kill the victims when it had no direct evidence of his motive and no direct evidence of his involvement in the actual shootings. Although our deferential standard of review under 28 U.S.C. § 2254 precludes relief on Mr. Torres's sufficiency of the evidence claim, Mr. Torres is entitled to relief on his claim regarding the jury instructions. Because those instructions did not properly inform the jury that it was required to find that Mr. Torres intended to kill the victims, I would reverse the district court's decision on that claim and direct the state to vacate the murder convictions and provide Mr. Torres with a new trial before a properly instructed jury. In any event, I hope the Oklahoma courts will make changes in their approved jury instructions that will alleviate this problem in the future.